HAGGERTY et al., *Appellants*, v. ST. LOUIS ICE MANUFACTURING & STORAGE COMPANY.

### Division Two, March 15, 1898.

1. **Criminal Law**: INTENTION: MOTIVE. In misdemeanors it is the *act done and that alone* which violates the law, and the *motive* which prompts the violation is altogether *dehors* the crime committed.

2. ———: GAME: POSSESSION. The law prohibiting any person "to purchase, have in his possession or sell any of the game birds or animals specified" in the statute during certain months of the year, and making it a misdemeanor to do so, is valid. And the intention or purpose of the person having such game in his possession is immaterial and not to be considered.

3. ———: GAME: OWNERSHIP. Game, or animals *ferae naturae*, belong to the sovereign authority, in trust for all the people of the State, and the legislature has authority to make penal their destruction during certain months, and such an act being valid, it necessarily follows, as an indubitable corollary thereto, that it also has authority to make penal the possession or selling of such game during the prohibited period.

4. **Illegal Contracts:** MALUM PROHIBITUM. One person can not contract with another to commit a misdemeanor. And though the offense be only *malum prohibitum* the consequence is the same as if the act were *malum in se*, since in principle there is nothing which should cause a different result in one case rather than in the other.

5. ————: POSSESSION OF GAME: COLD STORAGE. The plaintiffs contracted with the defendant to keep in cold storage during the prohibited period and return in good condition when called for, game or wild animals, the selling or possession of which during that time is prohibited by the statute and made penal. The defendant kept the game one year, and sent plaintiffs an account for doing so, which was paid, and when the game was removed soon thereafter it was found to be in a damaged condition, and to reimburse themselves plaintiffs brought suit for $7,000 as damages for a breach of the contract. *Held*, that as the contract itself was an agreement to commit a misdemeanor, it could not be enforced, and that the court would leave the parties where it found them, "unsanctified by its favor and unaided by its process."

*Appeal from St. Louis City Circuit Court.*—HON. LEROY B. VALLIANT, Judge.

AFFIRMED.

*R. H. Kern* for appellants.

(1) It is the State and not the individual who can complain in such cases as this. *Parton v. Hurdy*, 1 Gray, 119; *Mott v. Trust Co.*, 19 Barb. 568; *Gold Mining Co. v. Bank*, 96 U. S. 640; *Nemizer v. Wright*, 75 Va. 239; *People v. O'Neil*, 7 Mich. 335. (2) When the possession is back of the time when it became unlawful to take game, the presumption has no further force as evidence, and what was then lawful can not be made a crime by lapse of time. *Powhatan Steamboat Co. v. Railroad*, 24 How. 247. (3) Did the statute mean that the bare possession of game should be absolute evidence of guilt? If so, why does section 3902, Revised Statutes of Missouri, say that the possession of such game shall only be *prima facie* evidence of such guilt? It clearly was its intent to allow one having

game to show that he did not kill it or buy it during the closed season, and also that he did not acquire it in the State of Missouri at all. R. S. 1889, sec. 3902; *Harris v. Runnell*, 12 How. 79; *Sprague v. Rooney*, 104 Mo. 349; *Bank v. Owens*, 2 Pet. 536; *Copell v. Hall*, 7 Wall. 558; *Bank v. Matthews*, 8 Otto, 624; *Hudgins v. Greenbaum*, 61 Mo. 110; *Green v. Corrigan*, 87 Mo. 370; *St. Louis v. Consolidated Coal Co.*, 20 S. W. Rep. 699. (5) The object of the statute was to prohibit the killing and the sale of game in certain seasons prohibited by law and thus protect the game in Missouri, and no question of moral turpitude affecting the public interests, like gambling, etc., is involved. It was never the intention of the legislature to say that property lawfully acquired and simply stored without any offer to sell the same in a period prohibited by law, should be lost and that the severest hardship would be visited upon the plaintiff, entailing a loss of $7,000.

*Henry E. Mills* for respondent.

(1) The contract upon which appellants rely is for the storage of such game as sections 3901 and 3902 declare it to be a misdemeanor for any person to have in possession during the period known as the "closed season." *State v. Randall*, 1 Mo. App. 16; *State v. Judy*, 7 Mo. App. 524; *State v. Farrell*, 23 Mo. App. 176; *Geer v. Connecticut*, 161 U. S. 519; *McCready v. Virginia*, 94 U. S. 391; *Manchester v. Massachusetts*, 139 U. S. 240; *State v. Farrell*, 23 Mo. App. 176; *Ex parte Maier*, 103 Cal. 476. (2) No act which is forbidden by law, whether *malum in se* or *malum prohibitum*, can constitute a valid consideration for a contract. The law which prohibits the end will not lend its aid in promoting the means designed to carry it into effect, and in this respect the law gives no counte-

nance to the old distinction between *malum in se* and *malum prohibitum*. That which the law prohibits, either in terms or by fixing a penalty to it, is unlawful; and it will not promote in one form that which it declares wrong in another. *Friend v. Porter*, 50 Mo. App. 89; *Sprague v. Rooney*, 104 Mo. 360; *Connor v. Black*, 119 Mo. 142; *Garrett v. Kansas Coal Mining Co.*, 113 Mo. 339; *Bick v. Seal*, 45 Mo. App. 475.

SHERWOOD, J.—The business of plaintiffs, resident in St. Louis, was that of dealers in game, while the defendant corporation was engaged in that city in the business of "cold storage," which embraced the storing and preservation of produce and game of all kinds.

Plaintiffs, during what is known as the "open season," were accustomed to buy and sell the different kinds of game, and when what is known as the "closed season" was about to arrive, were in the habit of storing such game as remained on their hands until such time as the "open season" again returned, when they would resume their erstwhile prohibited business. So it was that in the year 1892, between the fifteenth of November and the twenty-sixth of December, the defendant corporation made plaintiffs an offer to carefully store and preserve the same in a cold, frozen condition for such time as plaintiffs might store the same with it, and to restore the same to plaintiffs in as good condition as when received from plaintiffs. This offer was based upon the consideration of the payment of so much per pound for such storage. Plaintiffs desiring that such game be so kept and preserved, and intending that such game should be stored with defendant corporation during the "closed season," and withdrawing it when the "open season" should return,

accepted the offer aforesaid, and on the eighteenth of November, 1892, stored with defendant a large quantity of game, to be withdrawn from defendant's custody when and at such times as the law would permit plaintiffs to dispose of the same. At the time of its being thus stored, the game was in good condition. On November 18, 1893, defendant presented to plaintiffs a bill for such storage, amounting, etc., which plaintiffs paid. Thereupon plaintiffs proceeded to remove such game from the cold storage rooms of defendant, and in doing so discovered that defendant had failed to preserve such game in a cold and frozen condition, whereby the same became rotten and worthless, and was not in good condition, as when delivered to defendant. For this breach of contract damages in the sum of $7,000 was demanded, and being refused, this suit was brought. This is the substance of the first count in the petition; the second count like unto it.

Defendant demurred to the first count on these grounds: ''Now comes defendant and demurs to the first count of plaintiffs' second amended petition for the reason that it does not state a cause of action against defendant, and because it does show affirmatively that plaintiffs endeavored to make with defendant a contract for the storage of game during the period of the year when the possession of such game was prohibited by law, and that the alleged contract was unlawful and in violation of a penal statute of the State of Missouri and non-enforcible, and because it appears that at plaintiffs' request said game was carried on plaintiffs' account during the season of 1893, prohibited by law.'' The trial court adjudged the petition insufficient in law, and plaintiffs declining to plead further, final judgment was rendered, hence this appeal.

Section 3901, Revised Statutes 1889, prohibits the killing of certain game at certain times of the year. Section 3902, *Ib.*, makes it a misdemeanor for any person to "purchase, have in his possession or sell any of the game birds or animals specified in the next preceding section, or any flesh pieces or parts of said animals, during the season when the catching and killing of same is prohibited, or shall purchase, have in possession or sell any of the game birds or animals caught or killed contrary to the provisions of said sections."

· As shown by the very interesting and exhaustive opinion of Mr. Justice WHITE in *Geer v. Connecticut*, 161 U. S. 519, "from the earliest traditions the right to reduce animals *ferae naturae* to possession has been subject to the control of the law giving power." The exercise of this power has been definitely traced back even as far as the time of Solon, who forbade the Athenians to kill game. And in France, as early as the Salic law, the right to reduce a part of the common property in game to possession and consequent ownership was regulated by law. Such regulations prevailed in every country in continental Europe and in England. Treating of this subject, BLACKSTONE says: "There still remains another species of prerogative property, founded upon a very different principle from any that have been mentioned before; the property of such animals *ferae naturae*, as are known by the denomination of game, with the right of pursuing, taking and destroying them; which is vested in the king alone and from him derived to such of his subjects as have received the grants of a chase, a park, a free warren or free fishery. . . . . . . . In the first place then, we have already shown, and indeed it can not be denied, that by the law of nature every man from the prince to the peasant has an equal right of pursuing and taking to his own use all such creatures as are

*ferae naturae*, and, therefore, the property of nobody, but liable to be seized by the first occupant, and so held by the imperial law even so late as Justinian's time. . . . . . . . But it follows from the very end and constitution of society that this natural right, as well as many others belonging to a man as an individual, may be restrained by positive laws enacted for reasons of State or for the supposed benefit of the community." 2 Bl. Com. 410. This prerogative of the king as an attribute of government recognized and enforced by the common law of England by appropriate and often times by severe penalties and forfeitures, was vested in the Colonial governments of this country, and when these governments threw off the yoke of the mother country, that right of sovereignty passed to and was vested in the respective States. This sovereign attribute and power as existent in the States of this Union has often been exercised by them by passage of laws in the most of these States, for the protection and preservation of game; and it seems never to have been called in question. Numerous adjudications attest this fact. In such cases the common ownership of game which otherwise would remain in the body of the people, is lodged in the State to be exercised like all other govermental powers in the State in its sovereign capacity to be exercised in trust for the benefit of the people and subject, of course, to to such regulations and restrictions as the sovereign power may see fit to impose. Such regulatious appropriately fall within the domain of the police power of the State.

In *Ex parte Maier*, 103 Cal. 476, it is said: "The wild game within a State belongs to the people in their collective, sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, abso-

lutely prohibit the taking of it, or traffic or commerce in it if deemed necessary for its protection or the preservation of the public good.    Expressing the same view, it is said by the Supreme Court of Minnesota: "We take it to be the correct doctrine in this country, that the ownership of wild animals, so far as they are capable of ownership, is in the State, not as a proprietor but in its sovereign capacity as the representative and for the benefit of all its people in common." *State v. Rodman*, 58 Minn. 393.    In *Magner v. People*, 97 Ill. 320, in passing upon the subject now under consideration, it is said:    "Stated in other language, to hunt and kill game is a boon or privilege, granted either expressly or impliedly by the sovereign authority—not a right inherent in each individual and consequently nothing is taken away from the individual when he is denied the privilege at stated seasons of hunting and killing game.    It is, perhaps, accurate to say that the ownership of the sovereign authority is in trust for all the people of the State, and hence by implication it is the duty of the legislature to enact such laws as will best preserve the subject of the trust and secure its beneficial use in the future to the people of the State.    But in any view, the question of individual enjoyment is one of public policy and not of private right."

This right of the States to provide and enforce regulations respecting the protection and preservation of game has received frequent recognition at the hands of the Supreme Court of the United States, thus:    In *McCready v. Virginia*, 94 U. S. 395, the power of the State of Virginia to prohibit citizens of other States from planting oysters within the tide waters of that State was upheld by this court.    In *Manchester v. Massachusetts*, 139 U. S. 240, the authority of the State of Massachusetts to control and regulate the catching of fish within the bays of that State was also maintained.    See,

also, *Geer v. Conn.*, *supra*, and *State v. Farrell*, 23 Mo. App. 176, and cases cited; *State v. Lewis*, 33 N. E. Rep. 1024.

A statute of New York prohibited the killing or having in possession game birds of the kinds specified, after the first of March (Laws 1871, chap. 721, pp. 1671, 1677, secs. 7, 8, 33) and touching this statute, the court of appeals of that State observed:  "It is admitted in this case that the defendant had possession of game after the first of March, and the fact alleged, that it was either killed within the lawful period or brought from another State where the killing was lawful, constitutes no defense.  The penalty is denounced against the selling or possession after that time, irrespective of the time or place of killing.  The additional fact alleged, that the defendant had invented a process of keeping game from one lawful period to another, is not provided for in the act, and is immaterial," and the validity of the statute was upheld.  *Phelps v. Racey*, 60 N. Y. 10. That case is directly in point, and fully sustains the action of the trial court in adjudging the petition insufficient.

Plaintiffs in their petition, when speaking of their purpose in preserving such game, say, in substance, that they *intended* that said game should be stored with defendant corporation during the "closed season," and withdrawn upon return of the "open season."  The offense prohibited by section 3902 is a *misdemeanor*, and in such case the intention of the *misdemeanor* cuts no figure in the case, since in that class of crimes *intention* constitutes no element of the offense.  It is the *act done and that alone* which violates the law, and the *motive* which prompts the violation is altogether *dehors* the crime committed.  This point is illustrated by various adjudications respecting the sale of liquors to minors and the marriage of minors supposing the parties in

each case to be of age, etc., etc. 1 Whart. Crim. Law
[9 Ed.], sec. 23a, p. 35; sec. 88 pp. 113, 115, and
cases cited; *Howell v. Stewart*, 54 Mo. *loc. cit.* 404.

In this case the statute makes no exceptions to the
rigid rule which it prescribes.    The acts therein men-
tioned are unconditionally and absolutely forbidden,
and this is so because the legislature doubtless thought
that the best way of accomplishing the result they de-
sired and the only means of attaining it.    They there-
fore resorted to arbitrary prohibition.    Had *scienter*
been required by the statute, its very object would have
been defeated, as *scienter* would be in the majority of
instances impossible of proof.    1 Whart.    Crim.    Law
[9 Ed.], sec. 88, p. 117.

It was to prevent the easy evasions of the statute
that the law was passed in its present shape.    And on
this ground it is analogous to statutes prohibiting the
manufacture or sale of oleomargarine (*State v. Bock-
struck*, 136 Mo. 335), and it is the only ground upon
which such enactments can be upheld.    The end being
granted, to wit, the power of the legislature to enact a
law for the protection and preservation of game; the
means to effectuate that end, to wit, the authority to
prevent the law thus passed from being evaded by pro-
hibiting and making penal the possession of game after
a certain period, follows as an indubitable corollary.
*Ex parte Marmaduke*, 91 Mo. *loc cit.* 262, and cases
cited.

Recurring to the petition, it shows on its face that
plaintiffs contracted with defendant corporation for
the commission of a misdemeanor.    It is true the of-
fense is but *malum prohibitum*, but the consequences are
the same as if the act were *malum in se*, since in princi-
ple there is nothing which should cause the result to
differ in the former case from the latter.    The law will
not stultify itself by promoting on the one hand what

State ex rel. v. Staed.

it prohibits on the other, and will for this reason leave the parties to this suit where it finds them, unsanctioned by its favor and unaided by its process. *Kitchen v. Greenalaum*, 61 Mo. 110.

Therefore the doctrine announced in *Sprague v. Rooney*, 104 Mo. 360 (overruling the former decision in same case, in which was a dissent) applies here, and hence judgment affirmed.     All concur.