## GRATZ v. McKEE et al. *

(Circuit Court of Appeals, Eighth Circuit. November 13, 1920. Petitions for Rehearing Denied February 10, 1921.)

No. 5285.

**1. Navigable waters ⊙⊃1(1)—Stream must be capable of practical general use.**

A small stream, running through a swampy country, used only in times of high water to a small extent for floating of logs and for skiffs and dugouts by people living near, because of the bad condition of the roads, *held* not navigable in any sense that would constitute it a part of the public waters of the state.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Navigable.]

**2. Fish ⊙⊃5(1)—Owner of stream has property in fish.**

The owner of land has a special property interest in the fish in a stream on his land; but until he reduces them to possession, by taking them in a lawful way, such interest is subject to regulations by the state for their protection in the interest of the public generally.

**3. Fish ⊙⊃7(3)—Taken by trespasser becomes property of owner of land.**

While there is no unqualified ownership of fish until they have been caught and reduced to possession, they must be lawfully taken to vest

---

⊙⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari granted 254 U. S. —, 41 Sup. Ct. 535, 65 L. Ed. —.

title in the taker; and where mussels were taken for the shell by a trespasser from a nonnavigable stream on the land of another, the shell *held* to have become the property of the owner of the land, and not of the trespasser.

**4. Fish ☜5(1)—Property in fish not impaired by statutory regulations.**

Rev. St. Mo. 1909, § 6508, providing that "the ownership of and title to all birds, fish and game * * * not now held by private ownership, legally acquired, is hereby declared to be in the state, and no fish, birds or game shall be caught, taken or killed, * * * or had in possession, except the person so catching, taking, killing or having in possession shall consent that the title of said birds, fish and game shall be and remain in the state of Missouri for the purpose of regulating and controlling the use and disposition of the same after such catching," etc., is a statute of regulation only, and leaves private ownership unimpaired, except as to the right of the state to prescribe the seasons and conditions under which fish and wild game may be taken, used, and disposed of.

**5. Appeal and error ☜882(17)—Counsel estopped to object to finding expressly requested by them.**

Where counsel for plaintiff in error in an action of trespass expressly requested the appellate court, in case of reversal, to determine the measure of damages applicable, in view of a new trial, which question was dependent on whether the trespass, as shown by the evidence, was willful, such counsel cannot afterward object because the court did so, on the ground that it invaded the province of the jury.

In Error to the District Court of the United States for the Eastern District of Missouri; John C. Pollock, Judge.

Action at law by Benjamin Gratz against James S. McKee and others. Judgment for defendants, and plaintiff brings error. Reversed.

For former opinion, see 258 Fed. 335, 169 C. C. A. 351.

S. Mayner Wallace, of St. Louis, Mo. (Shepard Barclay, of St. Louis, Mo., on the brief), for plaintiff in error.

Lon O. Hocker, of St. Louis, Mo., and William Hoffman, of Muscatine, Iowa (Hoffman & Hoffman, of Muscatine, Iowa, and Jones, Hocker, Sullivan & Angert, of St. Louis, Mo., on the brief), for defendants in error.

Before HOOK and CARLAND, Circuit Judges, and VAN VALKENBURGH, District Judge.

VAN VALKENBURGH, District Judge. Plaintiff in error, plaintiff below, sued the defendants in error, defendants below, to recover the value of 307½ tons of mussel shells alleged to have been taken from the lands of plaintiff's assignors and converted to defendants' use. The trial court directed a verdict for the defendants, which judgment was affirmed by this court. 258 Fed. 335, 169 C. C. A. 351.

The plaintiff invoked the rule of the common law, that where title to animals feræ naturæ is obtained by taking possession thereof, the taking must not be wrongful, and if the taking is effected by one who is at the moment a trespasser, no title to the property is created in him, but it vests in the owner of the soil. This court was of opinion, however, that whatever might be the effect of this rule in general, the legislation of Missouri (R. S. Mo. §§ 6508, 6551) vested the title

of the killed mussels in the state, and not in the plaintiff, and for this reason the rule stated could not aid the plaintiff. 258 Fed. 339, 169 C. C. A. 351.

Upon petition for rehearing, the court being of opinion that the ruling upon this point involved doubt sufficient to warrant reargument and resubmission, the petition for rehearing was granted. The main facts are so substantially stated in the former opinion that extended repetition is unnecessary. Such additional references to the record as may be essential to clearer understanding of the points ruled will be made in the course of the opinion.

We adhere to the conclusion originally reached that the fresh-water mussel is a shellfish capable of locomotion, in a most limited degree to be sure, but sufficient to bring it within the category of migratory fish; that as such it cannot be deemed part of the realty, within R. S. Mo. 1909, § 5448, allowing treble damages in certain cases for digging up and carrying away any substance or material, being a part of the realty. The rules laid down in certain cases respecting oysters, also shellfish, are not applicable here, because these mussels were neither planted nor confined in any manner prescribed to create a special private ownership in them as such. Furthermore, the fact that they were taken, not for food, but for the commercial value of their shells, cannot avail the plaintiff. The shells do not differ in principle from the pelts of fur-bearing animals, which are hunted and caught for these alone, and not for any other useful purpose. While in all the particulars named the subject-matter of this controversy lies extremely close to the border which separates diverging lines of judicial decision, nevertheless the law must be applied with strict reference to the actual legal status involved.

It is conceded that plaintiff's assignors own the land through which Little river flows, and from which these mussels were taken. Therefore it had title, not only to both banks, in so far as any banks are defined, but likewise to the soil underlying the bed of the stream. These lands were selected and conveyed as swamp or overflowed lands. It appears from the record that they consist of a swampy tract, through which, during most of the year, there is little or no well-defined stream or current; the so-called river resolving itself rather into pools along its course. During periods of high water the semblance of a river is more apparent. It is at those times, and perhaps at all times in some places, susceptible of being used in a very limited way for floatage, or by small rowboats or dugouts for the convenience of those living in the vicinity. As stated by the record:

"At times people rafted and floated logs for sawmills on Little river. It was only at different times they did that; when there was a sawmill on the bank of the river there, and when the stage of the water was high enough, they floated logs for the mill by way of the river. * * * The stream was used for small craft, small boats and dugouts, to carry provisions and things of that kind. The roads were not particularly good in that country at different seasons of the year. When the river was high, the roads would be pretty bad from the water. The principal transportation there would not be by the river, for people going back and forth; but the individuals used it, whenever they saw fit, to carry things. If they wanted to go up or down the river and carry a little amount, probably they would go in boats. If they lived on the

river, they would carry anything to their homes, back and forth, that way. * * * It was just a low swamp, first on the one side and then on the other, with a little meandering channel, small meandering channel, probably 50 or 100 feet. It meandered diagonally from the northeast to the southwest across this territory by maybe two townships. Quite a good many logs were floated down it. At Wardell there was a sawmill; two that I know of. The river was the only way of travel for a good part of the time, in boats. The roads in that country were so poor that you couldn't go with wagons. During wet weather the condition of the roads was bad; muddy. People would go from place to place in little dugouts. A 'dugout' is a log split in two and carved out like a half watermelon. Things were carried in the dugouts, groceries and supplies of all kinds; and occasionally make a trip across the swamp over to the mills; take milk or corn in the dugout, and go across to a place where they got a farmer to haul their stuff to Kennett."

[1] In its former opinion the court found the stream to be "nonnavigable, except in a very restricted sense." Counsel for defendants in their brief admit that the river is not navigable in the full sense of that term, but assert that it is capable of a public use for rafting, floating logs, and for navigation in small boats. Upon a full consideration of the record, we are of opinion that the river is nonnavigable in any sense that would constitute it a part of the public waters of the state. Harrison v. Fite, 148 Fed. 781, 78 C. C. A. 447.

"A stream is navigable in fact only where it affords a channel for useful commerce and of practical utility to the public as such. The fact that there is water enough in places for rowboats or small launches, answering practically the same purpose, or that hunters and fishermen pass over the water with boats ordinarily used for that purpose, does not render the waters navigable." Schulte v. Warren, 218 Ill. loc. cit. 119, 75 N. E. 785, 13 L. R. A. (N. S.) 745.

It is held that navigable waters must be capable of practical general uses. Hubbard v. Bell, 54 Ill. 110, 5 Am. Rep. 98.

"If its location is such, and its length and capacity so limited, that it will only accommodate a few persons, it cannot be considered a navigable stream for any purpose. It must be so situated, and have such length and capacity, as will enable it to accommodate the public generally as a means of transportation." Griffith v. Holman, 23 Wash. 347, 63 Pac. 239, 54 L. R. A. 178, 83 Am. St. Rep. 821.

To the same effect is the great weight of authority. Rowe v. Granite Bridge Corporation, 21 Pick. (Mass.) 344; Nutter v. Gallagher, 19 Or. 375, 24 Pac. 250; Haines v. Hall, 17 Or. 165, 20 Pac. 831, 3 L. R. A. 609; Burroughs v. Whitwam, 59 Mich. 279, 26 N. W. 491; Wethersfield v. Humphrey, 20 Conn. 218; Ricks Water Co. v. Lumber Co., 107 Cal. 221, 40 Pac. 531, 48 Am. St. Rep. 125; Olive v. State, 86 Ala. 88, 5 South. 653, 4 L. R. A. 33; Morrison Bros. v. Coleman, 87 Ala. 655, 6 South. 374, 5 L. R. A. 384.

The decision must rest upon the special facts in each case, and in this state is said generally to be one for the jury. Weller v. Missouri Lumber & Mining Co., 176 Mo. App. 243, 161 S. W. 853.

But, even though this so-called river be regarded as navigable, in this very restricted sense, for small uses in the floatage of logs and for skiffs and dugouts during high water, when the roads are bad, as is usual in most swamp and overflowed districts, nevertheless such local, limited, and intermittent forms of use cannot transform waters

otherwise nonnavigable into navigable streams nor catalogue them among the public waters of the state; and the use which any person may lawfully make of such waters is limited to such incidental right of floatage or qualified navigation.

"There is a manifest difference between public streams that can be used successfully for the running of boats and vessels for the purpose of commerce, and those which are only capable of being used for the floatage of lumber and logs in rafts or single pieces. The riparian owners are entitled to the beneficial and sole use of the latter streams, except for floatage; and when such streams have become unfitted for valuable public use, and have actually ceased to be used for public highways, there is no more reason for holding them to be public than in the case of a land highway which has been abandoned and is useless." City of Grand Rapids v. Powers, 89 Mich. 94, 50 N. W. 661, 14 L. R. A. 498, 28 Am. St. Rep. 276; Sterling v. Jackson, 69 Mich. 488, 37 N. W. 845, 13 Am. St. Rep. 405; Hall v. Alford, 114 Mich. 165, 72 N. W. 137, 38 L. R. A. 205.

In the case at bar the mussels were taken from the stream in the following manner:

"At Wardell they were taken principally with tongs, a kind of what they call an oyster fork. It has a handle, and they go together like that (illustrating), and they raise them up. The water there was most favorable for using tongs. During the real low stages they waded and got them out. I would say that the principal part of them were taken with tongs. The shells can be taken with tongs very nicely in anything up to about 12 feet of water. In 1913 and 1914 Little river was very crooked; a very crooked stream; lots of deep short bends in it; and there was quite a variation in the depth. Some places were considerably deeper than others, and they would be right close together, too. It seemed to run off in holes. It was a very swampy stream; that is, it ran out flat, and there was growth in the stream, trees. In certain places this swampy condition existed on either side of the channel. * * * After the mussels were dug, they were boiled out by the diggers, on the banks of the river, generally, where they are taken, or very close. The meat was taken out of the shells, and they were prepared for market. * * * Under ordinary conditions, during the summer and working season, I don't think the shells would be on the bank over two or three weeks." (Testimony of Witness McClung.)

"The way that I dug shells was to go out in the water and pick them up by hand, with my fingers. I could not see them; I had to feel for them; the water was muddy. A part of them would be almost buried in the mud. I have been acquainted with the mussel down there all my life. In digging shells down there other people used forks, something like a potato fork, that had eight or nine prongs to it. They would fork them that way. And the other way they had tongs, something like those tongs used in digging up snails. They would fork them in deep water, where they couldn't reach them any other way. * * * The length of time a pile remained on the bank before being hauled would depend on getting cars; sometimes from ten days to a month. (Testimony of Witness Hickerson.)

In the brief of defendants' counsel it is said:

"The method is either to wade in the stream at low tide, or go in boats in high water, and by means of hooks or other devices take the mussels from the bed of the stream."

It is apparent that the mussels were taken by those who went upon the land of plaintiff's assignors expressly for that purpose; that they were taken indiscriminately either by waders, who picked them out, or dug them out with forks, or from boats in places where the water happened to be too deep for wading. The shells were then piled upon

the banks or higher ground, also belonging to plaintiff's assignors, where they remained for periods ranging from ten days to a month, and were thence hauled to the railroad for shipment. All these unlicensed acts were trespasses.

[2] The decision of this case, it would appear, must rest upon the determination of title and ownership, if any, to which the plaintiff in this case has succeeded. Under the common law as it has existed, and still exists, in England, and generally as transmitted to the states of the Union, modified by statutory enactment and supplemented by usage, the owner of the soil would have a qualified, but substantial, property interest in the fish· upon his own land, with the exclusive right to reduce it to possession superior to that of others, and subject only to regulation by the state as a sovereign and under its police powers. State v. Mallory, 73 Ark. 236, 83 S. W. 955, 67 L. R. A. 773, 3 Ann. Cas. 852; Hall v. Alford, 114 Mich. 165, 72 N. W. 137, 38 L. R. A. 205; Payne v. Sheets, 75 Vt. 335, 55 Atl. 656; Peters v. State, 96 Tenn. 682, 36 S. W. 399, 33 L. R. A. 114; Lincoln v. Davis, 53 Mich. 375, 19 N. W. 103, 51 Am. Rep. 116; Sterling v. Jackson, 69· Mich. 488, 37 N. W. 845, 13 Am. St. Rep. 405; Schulte v. Warren, 218 Ill. 108, 75 N. E. 783, 13 L. R. A. (N. S.) 745; Realty Co. v. Johnson, 92 Minn. 363, 100 N. W. 94, 66 L. R. A. 439, 104 Am. St. Rep. 677; Cobb v. Davenport, 33 N. J. Law, 223, 97 Am. Dec. 718; Kellogg v. King, 114 Cal. 378, 46 Pac. 166, 55 Am. St. Rep. 74.

·The rule is well and comprehensively stated by the Supreme Court of Arkansas in State v. Mallory, supra:

"It is insisted that these questions generally rise in suits between individuals, involving only individual rights, and that the recognized right to take game on one's own land and to prevent others from so doing is merely a right to prevent a trespass on the land, and not a right of property growing out of the soil. But this is not a correct estimate of the force of these authorities, for the cases all hold that it is a right inhering in the soil, and not a mere right to prevent an invasion of the possession of the owner. * * * We therefore conceive it to be settled by authority and by long recognition in the law that the owner of land has a right to take fish and wild game upon his own land, which inheres in him by reason of his ownership of the soil. It is a property right, as much as any other distinct right incident to his ownership of the soil. It is not, however, an unqualified and absolute right, but is bounded by this limitation: That it must always yield to the state's ownership and title, held for the purposes of regulation and preservation for the public use. These two ownerships or rights—that is to say, the general ownership of the state for one purpose, and the qualified or limited ownership of the individual, growing out of his ownership of the soil—are entirely consistent with each other, and in no wise conflict. The transitory nature of the property renders the benefits so diffusive that all may join in the enjoyment thereof, and for that reason the sovereign holds as the representative of the public, so as to regulate and protect the common use. Still the right of the landowner to hunt and fish on his own lands is to that extent a special property right, though subordinate to the other."

[3] It is true that unqualified ownership becomes complete only when the fish or animal is reduced to possession by capture in conformity with state regulation. These mussels have been so reduced to possession, and the question presented is: To whom does the title inure? To the trespasser who took them, or to the owner of the soil whose ·

rights have been invaded? If our conception of the relationship of the parties and of the rights of the owner of the land is correct, then the rule of law widely prevailing in this country is not different from that obtaining in England, and that is that:

"Title to property created merely by the act of reducing a thing into possession necessarily implies a reduction into possession effected by an act which is not in any way of a wrongful nature. Such an act, therefore, effected by one who is at the moment a trespasser, cannot create a title to property."

In such case the title inures at once to the owner of the land. Blades v. Higgs, 11 H. L. C. 621; State v. Repp. 104 Iowa, 305, 73 N. W. 829, 40 L. R. A. 687, 65 Am. St. Rep. 463; Brown v. Eckes (City Ct.) 160 N. Y. Supp. 489, Ann. Cas. 1917B, 981; Harper v. Galloway, 58 Fla. 255, 51 South. 226, 26 L. R. A. (N. S.) 794, 19 Ann. Cas. 235; Commonwealth v. Chace, 9 Pick. (Mass.) 15, 19 Am. Dec. 348; Lonsdale v. Rigg, 11 Exch. 654; Rexroth v. Coon, 15 R. 1. 35, 23 Atl. 37, 2 Am. St. Rep. 863; State v. Mallory, 73 Ark. 236, 83 S. W. 955, 67 L. R. A. 773, 3 Ann. Cas. 852; Schulte v. Warren, 218 Ill. 108, 122, 75 N. E. 783, 13 L. R. A. (N. S.) 745.

[4] It would seem, therefore, that the plaintiff should prevail in this action, unless the statutes of Missouri, relating to fish and game, have diverted the current of the law from its accustomed channel and extinguished the rights which otherwise would be his. This court, in its original opinion, adopted this view, but misgivings upon this vital point caused this rehearing to be granted.

It is necessary to consider only section 6508, which reads as follows:

"The ownership of and title to all birds, fish and game, whether resident, migratory or imported, in the state of Missouri, not now held by private ownership, legally acquired, is hereby declared to be in the state, and no fish, birds or game shall be caught, taken or killed in any manner or at any time, or had in possession, except the person so catching, taking, killing or having in possession shall consent that the title of said birds, fish and game shall be and remain in the state of Missouri, for the purpose of regulating and controlling the use and disposition of the same after such catching, taking or killing. The catching, taking, killing or having in possession of birds, fish or game at any time, or in any manner, by any person, shall be deemed a consent of said person that the title of the state shall be and remain in the state, for the purpose of regulating the use and disposition of the same, and said possession shall be consent to such title in the state."

This section in its present form first appears in the Session Acts of Missouri for 1905, at page 159, and was approved March 10th of that year. As interpretive of its meaning but four Missouri cases are cited by counsel: State v. Blount, 85 Mo. 543; Haggerty v. Ice Mfg. & Storage Co., 143 Mo. 238, 44 S. W. 1114, 40 L. R. A. 151, 65 Am. St. Rep. 647; State v. Heger, 194 Mo. 707, 93 S. W. 252; State v. Weber, 205 Mo. 36, 102 S. W. 955, 10 L. R. A. (N. S.) 1155, 120 Am. St. Rep. 715, 12 Ann. Cas. 382. And no others bearing with appreciable directness upon the point in question have been brought to the attention of the court. State v. Blount was decided in 1885, and had under consideration section 1625, R. S. 1879, prohibiting seining and netting of fish in any of the waters of the state under certain conditions and subject to certain exceptions. The case arose prior to the en-

actment of section 6508, supra; but the court had under consideration the extent of the sovereign power of the state over fish, and announced the right of the individual landowner under the legal exercise of that sovereign power as it was then deemed to exist. The court said:

"The property which a man hath in animals, feræ naturæ, is a qualified property; that is, he may have the privilege of hunting, taking and killing them on his own premises, to the exclusion of others. He has but a transient property in these animals, usually called game, so long as they continue within his premises. 2 Black, Com. 394. This qualified, transient property, is not taken away by the statute. One who may have the right to take fish from such waters as are specified in the statute, is not denied the right to do so; but, in order to the preservation of fish and prevent their destruction, the state, in the exercise of its police power, simply forbids them from being taken by the use of certain prohibited methods. He can exercise such right in any other method than those which the statute prohibits."

This accords with the great weight of authority in other jurisdictions to which reference has been made. The opinion in State v. Heger, supra, 194 Mo. at page 711, 93 S. W. 253, contains the following statement which is supposed to uphold the contention of the defendants herein:

"The authorities are uniform in holding that the absolute ownership of wild game is vested in the people of the state, and that such is not the subject of private ownership. As no person has in such game any property rights to be affected, it follows that the Legislature, as the representative of the people of the state,.and clothed by them with authority to make laws, may grant to individuals the right to hunt and kill game at such times, and upon such terms, and under such restrictions as it may see proper, or prohibit it altogether, as the Legislature may deem best."

This declaration is expressly based upon the following decisions: Haggerty v. Ice Mfg. & Storage Co., 143 Mo. 238, 44 S. W. 1114, 40 L. R. A. 151, 65 Am. St. Rep. 647; Geer v. State of Connecticut, 161 U. S. 519, 16 Sup. Ct. 600, 40 L. Ed. 793; American. Express Co. v. People, 133 Ill. 649, 24 N. E. 758, 9 L. R. A. 138, 23 Am. St. Rep. 641; Ex parte Maier, 103 Cal. 476, 37 Pac. 402, 42 Am. St. Rep. 129; State v. Rodman, 58 Minn. 393, 59 N. W. 1098; Magner v. People, 97 Ill. 320; Phelps v. Racey, 60 N. Y. 10, 19 Am. Rep. 140. All of these cases, including those first above cited, were dealing either directly or indirectly with the effect and enforcement of statutes of regulation as between the state and the individual, and had not under consideration comparative rights of property between individuals, subject, of course, to such right of regulation. And as was well said in State v. Mallory, supra, the language of the courts in those cases must be, limited to the question under consideration, as must always be done when testing the soundness of a declared doctrine. Furthermore, the Supreme Court of Illinois, in Schulte v. Warren, 218 Ill. 122, 75 N. E. 783, 13 L. R. A. (N. S.) 745, expressly recognizes a qualified right of property in wild animals and birds as between the owner of the land on which they are found and a trespasser thereon, as also does the Supreme Court of Minnesota in Realty Co. v. Johnson, 92 Minn. 363, 100 N. W. 94, 66 L. R. A. 439, 104 Am. St. Rep. 677, and the Supreme Court of California in Kellogg v. King, 114 Cal. 378, 46 Pac. 166, 55 Am. St. Rep. 74. And nothing in Geer v. Connecticut is

inconsistent with this doctrine. In Haggerty v. Ice Mfg. & Storage Co., State v. Heger, and State v. Weber, supra, no purpose is disclosed of overruling the doctrine announced in State v. Blount. It must be assumed, therefore, that the absolute ownership declared in State v. Heger, supra, is identical with that declared from earliest times to inhere in sovereignty for the common benefit, which has never been supposed to be inconsistent with a qualified special property right of the landowner as against trespassers.

It is our duty to interpret statutes in accordance with their true spirit and purpose, so far as may be consistent with the language employed. Section 6508 contains striking internal evidences that the title declared was assumed for the sole purpose of regulation and control for preservation, propagation and protection, and not otherwise to determine the beneficial use and ownership. It says so substantially, not once, but twice, in this same section of 13 lines. Our view is that this enactment is a statute of regulation pure and simple, and leaves private ownership unimpaired, except as to the right of the state to prescribe the seasons and conditions under which fish and wild game can be taken, used, and disposed of. It is but declaratory of the title of the state and the law applicable thereto as it already existed. There is nothing in the decided cases that combats this view, but much that supports it.

It follows, from what has been said, that the judgment below should be reversed, and the case remanded for a trial anew in accordance with the principles announced in this opinion. Those from whom the defendants procured these mussels went wrongfully upon the premises of plaintiff's assignors, and by wading, or from boats produced for no other purpose, dug from the soil beneath these waters, upon private lands, over 300 tons of mussel shells, to which they had no title, and to which plaintiff's assignors had title, subject only to the right of regulation of the state. While it is desirable to preserve to the people at large all the rights of hunting and fishing to which they are legally entitled, it is equally necessary that such privileges should not be so extended as to destroy the still more sacred rights of private property to which our form of government is unalterably dedicated.

Inasmuch, however, as it appears that the trespass was not willful in a legal sense, but in a belief of right under a mistaken interpretation of the game laws of the state, and inasmuch, further, as the property taken cannot be deemed part of the realty within the meaning of the laws in such cases made and provided, the recovery should be limited to the actual value at the time of the conversion, as disclosed by the evidence, instead of that of the manufactured product, and treble damages cannot be sustained under section 5448, R. S. Mo. 1909.

### On Petitions for Rehearing.

PER CURIAM. Both plaintiff in error and defendants in error have filed petitions for rehearing, the plaintiff in error, as an alternative, requesting a modification of the opinion. With respect to that of defendants in error we are of opinion that it presents nothing that was not duly argued and considered at the hearing and in no respect

answers the conclusion reached. We are satisfied with that conclu-. sion, and the petition is accordingly denied.

[5] Plaintiff in error urges a modification of the last paragraph of the opinion filed, or a rehearing on the question of the measure of damages referred to therein. It is suggested that the opinion invades the province of the jury, and that the decision is contrary to that of the Supreme Court in Union Naval Stores Co. v. United States, 240 U. S. 284, 36 Sup. Ct. 308, 60 L. Ed. 644. That case was before the court and duly considered. The law involved and the situations presented in the two cases are essentially different. Our conclusion upon the facts recognized the rule announced in the case cited, but the evidence showed to our satisfaction that there was no willful trespass in the case at bar.

In their original brief filed in this case, under the heading "What is the Proper Measure of Damages," counsel for plaintiff in error said:

"The plaintiff's contention is not only that defendants were willful and intentional trespassers, but that they have concealed or destroyed evidence tending to the proof thereof. The facts referred to are hardly disputed now, and, as there was a demurrer to the evidence, their effect may be fully assumed." .

In their reply brief they again urged this issue upon the court in the following language:

"More important on this phase of review is the issue as to the *measure of damages*, which we believe should be solved by allowing the highest value the property acquired while in defendants' possession, since it is manifest from the testimony that defendants had no vestige of claim of right and no semblance of consent to excuse the trespass. * * *

"As this issue is so vitally material to the final result, we hope it will be disposed of on this review, should a new trial be awarded."

Obviously counsel were not seeking a ruling by this court upon the abstract proposition that where the trespass is willful the owner is entitled to the product manufactured by a third person, who knowingly purchased the same from the trespasser, a doctrine already most conclusively established by the Supreme Court in Union Naval Stores Co. v. United States, supra. What counsel evidently desired, and certainly invited, was a ruling upon this concrete case presented. We complied with this request. It is hardly consistent now to say that we had no power to do so.

The rehearing and modification prayed by plaintiff in error must accordingly be denied.