## GRATZ v. McKEE et al.

(Circuit Court of Appeals, Eighth Circuit. November 13, 1925. Rehearing Denied January 22, 1926.)

No. 6997.

**1. Appeal and error ⊜1213—Trial court was bound by direction to submit certain issue when evidence substantially identical.**

Trial court was bound by Supreme Court's direction to submit to jury certain issue, where evidence was substantially identical with that on which Supreme Court's direction was made.

**2. Appeal and error ⊜1099(8)—Holding of Circuit Court of Appeals, approved by Supreme Court, became law of case.**

Holding of Circuit Court of Appeals, approved by Supreme Court, that certain issues should be submitted, became law of case, where the evidence on each trial was substantially the same.

**3. Trover and conversion ⊜44—Instruction on damages held proper.**

In action for conversion of mussel shells taken from plaintiff's land, an instruction that measure of damages was the fair and reasonable market value at the time and place converted, with 6 per cent. interest from that date to date of verdict, held proper.

**4. Trespass ⊜67—License to take mussel shells held question for jury.**

Evidence held to justify submission to jury of question of license or nonlicense to take mussel shells from nonnavigable stream on plaintiff's land.

**5. Appeal and error ⊜1097(1), 1195(1)—Courts on second trial could not disregard ruling of Supreme Court on record substantially the same.**

Trial court and Circuit Court of Appeals on second trial could not disregard ruling of Supreme Court on record substantially the same as record on which Supreme Court based its ruling.

**6. Sales ⊜7—Party contracting with defendants to furnish latter with mussel shells for stated consideration per ton was not defendants' agent.**

Party contracting with defendants to furnish latter with mussel shells for stated consideration per ton held not defendants' agent in taking the shells from plaintiff's land.

**7. Sales ⊜7—Facts held without significance on question whether notice and knowledge of third party were chargeable to defendants.**

That the more shells shipped by a third party contracting to furnish defendants with mussel shells which he procured from plaintiff's land, the more money he would earn for himself, held to have no bearing on whether such party's notice and knowledge were chargeable to defendants.

**8. Trespass ⊜13—Act held not trespass ab initio.**

Distinct trespass, committed without license and in face of express notice to contrary, did

9 F.(2d)—38

not make first taking under assumed lawful entry trespass ab initio.

**9. Trespass ⊜30—Responsibility for trespass of third person held to arise from knowledge.**

Defendants' responsibility for trespass of third person furnishing them with mussel shells procured from plaintiff's land could arise only from defendants' knowledge of the unlawful taking, or from the unlawful taking with knowledge of abrogation of implied license.

**10. Evidence ⊜258(1)—Admission of agent held properly excluded, in absence of showing of general agency.**

Admissions of agent sought to be introduced held properly excluded, in absence of showing of general agency.

**11. Evidence ⊜243(2)—Admissions of agent after passing away of res gestæ are not binding on alleged principal.**

Admissions of agent after passing away of res gestæ are not binding on alleged principal.

**12. Witnesses ⊜388(2)—Statements not admissible for impeachment, when witness not questioned about them.**

Where witness was not interrogated with respect to certain statements tending to show his agency for defendants, testimony that he made such statements was not admissible as impeachment.

**13. Principal and agent ⊜22(1)—Admissions of agent held incompetent to establish his agency.**

Admissions of agent held incompetent to establish his agency for defendants in supplying them with mussel shells under contract.

**14. Appeal and error ⊜1059— Exclusion of testimony tending to show agency for defendants held not prejudicial.**

Exclusion of testimony tending to show agency for defendants, instead of contractual relation, held not prejudicial, where instructions submitted defendants' liability for trespass on plaintiff's land, whether as agent or as contractor.

**15. Trespass ⊜30—Third party's notice of failure to obtain lease held not chargeable to one with whom he dealt.**

Where agent of owner of lands, containing mussel shells, failed to obtain a lease to permit third party to take the shells, third party's knowledge of such facts held not chargeable to one to whom he furnished the shells.

In Error to the District Court of the United States for the Eastern District of Missouri; Charles B. Faris, Judge.

Action by Benjamin Gratz against James S. McKee and others. Judgment for defendants, and plaintiff brings error. Affirmed.

S. Mayner Wallace, of St. Louis, Mo., for plaintiff in error.

Lon O. Hocker, of St. Louis, Mo., and

William Hoffman, of Muscatine, Iowa (Hoffman & Hoffman, of Muscatine, Iowa, and Jones, Hocker, Sullivan & Angert, of St. Louis, Mo., on the brief), for defendants in error.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and PHILLIPS, District Judge.

VAN VALKENBURGH, Circuit Judge. This case has been twice before this court (258 F. 335, 169 C. C. A. 351; 270 F. 713, 23 A. L. R. 1393), and once before the Supreme Court (260 U. S. 127, 43 S. Ct. 16, 67 L. Ed. 167). The facts and issues appear largely in these prior decisions, but will be briefly stated here for a better understanding of the issues in the court below in the last trial as narrowed and defined in the course of the litigation.

The plaintiff in error, plaintiff below, is the assignee of two St. Louis corporations, which, during the years 1913 and 1914, owned and were in possession of certain described lands in Pemiscot county, Mo., through which flowed Little river, a stream nonnavigable in any sense that would constitute it a part of the public waters of the state. Gratz v. McKee (C. C. A.) 270 F. 713–716, 23 A. L. R. 1393; Harrison v. Fite, 148 F. 781, 78 C. C. A. 447.

Suit was brought originally against James S. McKee and William E. Bliven, of Muscatine, Iowa, doing business as McKee & Bliven Button Company, who were charged with having willfully and illegally taken from plaintiff's lands and carried away to Muscatine, Iowa, 307½ tons of mussel shells, and converted the same to their own use, which converted property was alleged to be of the value of $28,290, as a manufactured product. There was a second count seeking treble damages under a Missouri statute, but this count has passed out of the case under rulings of this court and of the Supreme Court.

At the first trial a judgment for the defendants was directed; upon writ of error to this court that judgment was at first affirmed, but upon rehearing reversed. 270 F. 713–721, 23 A. L. R. 1393. This later decision was upheld by the Supreme Court. 260 U. S. 127, 43 S. Ct. 16, 67 L. Ed. 167. The case was remanded to the District Court for trial by jury. A verdict and judgment for defendants resulted, to review which this writ is brought.

One W. A. Blake, as early as 1907, conceived the idea of digging mussels for mar-ket. He made overtures to McKee and Bliven in 1908, but without result. In 1913, Blake and others began digging mussels in Little river, and in large part upon plaintiff's land. There is evidence that some mussels were taken in 1912, but in very small quantities. Prior to these dates, they had been taken exclusively for fish bait, but not for market. In 1913, Blake again approached McKee and Bliven and an arrangement resulted whereby the latter agreed to pay Blake $9 a ton for shells, f. o. b. Wardell, the nearest shipping point from that part of the river from which the shells were taken. The record shows that Blake paid his diggers $8.50 per ton, the difference being his profit. The mussels, as they were recovered from the river, were piled upon the bank on plaintiff's property; the fleshy parts were removed by boiling; and, when a sufficient quantity had accumulated, they were hauled to the station, loaded and shipped to Muscatine, Iowa. Blake appears to have been without adequate capital to carry his operations for any great period, and, in consequence, he sought, and obtained, from McKee and Bliven advancements upon shells to be shipped. When the shells were received at Muscatine they were credited to Blake, and the balances resulting were struck and adjusted. This feature of the testimony becomes important in considering the court's charge as to the relationship existing between Blake and defendants in error of which plaintiff in error complains.

During 1913 Blake, and those from whom he purchased, dug, and shipped to McKee and Bliven eight carloads of mussel shells. June 30, 1914, the predecessors of plaintiff in error notified the McKee & Bliven Button Company that these mussels were taken without license and authority from their lands and demanded settlement for the trespass. August 4, 1914, Blake shipped one carload of shells from Wardell consigned to himself at Muscatine, Iowa. This carload was sold to defendants in error. From the record it appears that a part of this 1914 shipment, presumably one-half, was loaded at a point not adjacent to plaintiff's land, the balance, as before, at Wardell. Defendants in error introduced testimony to the effect that they were assured that this last carload did not come from the lands of plaintiff in error. As to the eight cars shipped in 1913, they set up the defense of implied license; that defense, as pleaded, was attacked by demurrer as insufficient in law. We think the action of the court in overruling that demurrer was right. A motion to

make the same more specific might, perhaps, have been entertained.

In general but two questions are involved: (1) Whether the court erred in submitting to the jury defendants' claim of implied license. (2) Whether the proper measure of damages was submitted. It is the contention of plaintiff in error that there was no substantial evidence of the taking of mussels prior to 1913 for commercial purposes, and therefore none from which license could be implied, and that the question of willful trespass which, if found, would increase the measure of the damages sustained, should have been submitted to the jury.

The case was tried almost entirely upon the testimony taken at the previous trial; the only additions material to this discussion being the testimony of the witnesses Bracey, Rehbehn, Crabtree, and Nicholas, which merely supplemented, and did not extend, the testimony of other witnesses respecting the practice of hunting, fishing, frogging, and taking mussels upon and from plaintiff's lands, except, perhaps, to the effect that Warren, a representative of the plaintiff, for certain purposes, permitted his teams to haul some of the shells and to receive pay therefor. To the admission of all this evidence plaintiff assigns error. The testimony of these witnesses, with the exception of the witness Bracey, as to the taking of shells, was confined entirely to the period during which this trespass is alleged to have taken place, to wit, 1913 and 1914. The testimony of Bracey points to some operations of this nature in 1912. This testimony, to that extent, was favorable to defendants in error. The case now before us, therefore, presents nothing new in the way of evidence which could alter or condition the theory upon which it should be submitted, and for that submission we are remitted to the opinion and direction of the Supreme Court, conditioned by the rulings of this court, which were either expressly or impliedly approved. From the standpoint of the plaintiff we may dismiss the effect of Warren's knowledge and participation, because the trial court expressly excluded such in its charge and instructed the jury that plaintiff was not bound thereby.

It is necessary at the outset to determine what the Supreme Court directed to be submitted, keeping in mind that it had before it a record containing, without material change, the evidence presented at this trial in the District Court. Mr. Justice Holmes said: "But it cannot be said as matter of law that those who took the mussels were trespassers; or even wrongdoers in appropriating the shells. The strict rule of the English common law as to entry upon a close must be taken to be mitigated by common understanding with regard to the large expanses of uninclosed and uncultivated land in many parts at least of this country. Over these it is customary to wander, shoot and fish at will until the owner sees fit to prohibit it. A license may be implied from the habits of the country. Marsh v. Colby, 39 Mich. 626 [33 Am. Rep. 439]. In Missouri the implication is fortified by the limit of statutory prohibitions to inclosed and cultivated land and private ponds. Rev. Stats. 1919, §§ 5662, 3654. There was evidence that the practice had prevailed in this region. Whether those who took these mussels were entitled to rely upon it, and whether, if entitled to rely upon it for occasional uses, they could do so to the extent of the considerable and systematic work that was done were questions for the jury. They could not be disposed of by the court." McKee v. Gratz, 260 U. S. 127, 43 S. Ct. 16, 67 L. Ed. 167.

[1] The trial court considered itself bound by this direction, upon evidence substantially identical, to submit to the jury the question of implied license, and in this we think its action was right. It did, however, under this restriction, by its charge, submit the evidence before it as favorably as plaintiff could ask. It said: "But you are not to consider long acquiescence of the owners as to the privilege of hunting, fishing and catching frogs, as I have already told you, on this land as serving, from the fact of the existence of these conceded rights, to conclusively show a license by implication to gather mussel shells for commercial purposes." The Supreme Court had said that this was a question for the jury, which could not be disposed of by the court.

[2] The same situation is presented with respect to the measure of damages. Concerning this the Supreme Court said: "So far as appears at present we see no reason for charging the defendants, if at all, with more than the value of the mussels at the time of conversion, as ruled below." The ruling of this court, to which this language refers, was that "the recovery should be limited to the actual value at the time of the conversion, as disclosed by the evidence, instead of that of the manufactured product." This ruling was emphasized, confirmed and made final upon rehearing. Therein plaintiff in error urged a modification on the ques-

tion of the measure of damages. In original and reply brief he urged this issue upon this court in the following language:

"The plaintiff's contention is not only that defendants were willful and intentional trespassers, but that they have concealed or destroyed evidence tending to the proof thereof. The facts referred to are hardly disputed now, and, as there was a demurrer to the evidence, their effect may be fully assumed. More important on this phase of review is the issue as to the measure of damages, which we believe should be solved by allowing the highest value the property acquired while in defendants' possession, since it is manifest from the testimony that defendants had no vestige of claim of right and no semblance of consent to excuse the trespass. * * * As this issue is so vitally material to the final result, we hope it will be disposed of on this review, should a new trial be awarded."

To this we replied: "Obviously counsel were not seeking a ruling by this court upon the abstract proposition that where the trespass is willful the owner is entitled to the product manufactured by a third person, who knowingly purchased the same from the trespasser, a doctrine already most conclusively established by the Supreme Court in Union Naval Stores Co. v. United States, supra [240 U. S. 284, 36 S. Ct. 308, 60 L. Ed. 644]. What counsel evidently desired, and certainly invited, was a ruling upon this concrete case presented. We complied with this request. It is hardly consistent now to say that we had no power to do so. The rehearing and modification prayed by plaintiff in error must accordingly be denied."

By these proceedings in the Supreme Court and in this court the rule of submission both of the issue of implied license and of the measure of damages upon this record became the law of the case. "It is well-established doctrine, in the federal courts at least, that a second writ of error or a second appeal in the same case only brings up for review the proceedings of the trial court subsequent to the mandate, and that it does not authorize a reconsideration of any questions, either of law or fact, that were considered and determined on the first appeal or writ of error, provided the testimony on each trial was substantially the same." Meyer & Chapman State Bank v. First National Bank of Cody (this court) 291 F. 42, and cases there cited and considered.

[3] The trial court charged that the measure of damages was the fair and reasonable market value of the article converted at the

time and place converted, with 6 per cent. interest from that date to the date at which the verdict was found. With respect to the car shipped in 1914, it charged that the measure of damages would be based upon the fair and reasonable market value of the shells at Muscatine, Iowa, because this car was shipped by Blake to himself at Muscatine, and was there turned over to the defendants. We think the measure of damages was accordingly submitted under the law of the case as theretofore conclusively ruled.

[4] It is to be noted that the record is not entirely barren of testimony that prior to 1913 mussels were taken for commercial purposes and not exclusively for personal use for bait and the like. This appears from the testimony of the witness Bracey and also from that of Blake who states that in 1912 one Prewitt was digging for one Soper and that one Eigert took some shells that were sent to Cairo. The court in its charge refers to this testimony in the following language: "There is no evidence that mussels and shells were ever taken from this river before 1912 for commercial purposes, except only in infinitesimal quantities for the purpose of fish bait."

While the evidence on this point was slight, nevertheless it was before the Supreme Court, and, coupled with the direction of that court, was sufficient to justify the trial court in submitting the question of license, or nonlicense, to the jury. In fact, we do not see how the trial court could well refuse so to do in view of the language of the Supreme Court already quoted, and which, in part, we repeat in connection with what has just been said: "There was evidence that the practice had prevailed in this region. Whether those who took these mussels were entitled to rely upon it, and whether, if entitled to rely upon it for occasional uses, they could do so to the extent of the considerable and systematic work that was done, were questions for the jury. They could not be disposed of by the court." McKee v. Gratz, 260 U. S. loc. cit. 136, 43 S. Ct. 17 (67 L. Ed. 167).

[5] The Supreme Court spoke from the record before it. Its language was not conditioned upon any subsequent showing. True, if a record substantially different were now presented, it might be said that this language no longer applied; but as the record is substantially the same the trial court did not feel at liberty to disregard the injunction laid upon it. That injunction is equally binding upon this court. This disposes of

the contention of plaintiff in error respecting the submission of the question of implied license and of the measure of damages.

[6, 7] It is further urged that the court erroneously instructed the jury as to the relationship existing between Blake and defendants in error. The jurors were told that Blake was not the agent of the defendants, but that he was merely a person with whom defendants in error had a contract to furnish them mussel shells for a consideration of so much per ton. The court's construction is entirely justified by the record. Blake was to receive $9 per ton for the shells furnished; he was not in the employ of the defendants otherwise; he made the difference between the contract price and what it cost him to obtain the shells. Therefore the fact that the more shells he obtained and shipped to the defendants, the more money he would earn for himself, has no bearing upon his notice and knowledge relating to the right to dig shells as chargeable to the defendants in error.

But, in any event, the court in its charge instructed the jury that with respect to the eight cars shipped in 1913, the defendants were responsible for the acts of Blake, provided no implied license existed, as witness, the following excerpts therefrom: "The defense in this case, is, first a general denial; second, in substance, that the defendants and Blake (which includes, as I shall presently tell you, in a sense, the defendants), etc. * * *" And again: "If Blake, who has been spoken of in this case, was a trespasser; that is, if Blake had no implied license to go on these lands and take shells, then Blake had no title in these shells, and Blake could confer upon defendants no better title than he himself had. * * * So, you have a right, I take it, to consider this question from the standpoint of Blake's situation, or Blake's knowledge." And again: "Blake, in whose shoes, in a way, defendants stand."

[8] But plaintiff in error insists that the ninth car shipped August 4, 1914, after the notice of June 30, 1914, to the McKee & Bliven Button Company that the mussels theretofore taken were taken without license and authority, involved trespass beyond dispute; that thereby defendants in error became trespassers ab initio, even though it should be found that there was an implied license to take these mussels prior to the giving of that notice. The rule invoked is thus stated in 26 Ruling Case Law, p. 943: "Where an authority given by law is exceeded, the party loses the benefit of his jus-

tification and the law considers him a trespasser ab initio, although to a certain extent he followed the authority given."

It is apparent that this rule has no application to the facts before us. The shipment in 1914 had no connection with prior acts in the matter of authority given by law. We have not before us an abuse of license, but one of assumed lawful entry and taking under license in 1913 and a separate and distinct taking in 1914 without license or authority, but in the face of express notice to the contrary; therefore defendants in error can be charged, if at all, only with the specific trespass arising from the unlawful taking of the mussels shipped in August, 1914. The evidence shows that not to exceed one-half of this car was loaded with mussels taken from the lands of plaintiff in error; this, however, would affect only the amount of the damages, if any. On behalf of defendants in error it was testified that they accepted this car only upon assurance that none of its contents came from the lands of plaintiff in error. From this it might be inferred that the notice of June 30, 1914, was, in effect, communicated to Blake.

Blake, however, denies that he ever at any time received notice of objection to the taking of mussels from the land in question. He says: "I did not know and did not concern myself about where the shells came from; that is to say, from whose land or from what part of the stream they came from. I never heard anybody ever make any objections, either to me or to anybody else down there, about taking shells out of the Little river at any time. I never had any complaint made to me by any landowners; and I never heard of any of the landowners ever making complaints to others."

[9] Of course, the responsibility of defendants in error could flow only from their own knowledge of unlawful taking, or from the unlawful taking by Blake with knowledge that the implied license, if such existed, had been abrogated by notice of some sort. Upon this subject the court charged as follows: "If you shall find and believe that there was a license that would not apply to whatever of these shells were shipped after notice, if you find there was notice given. If you shall find, then, that after a part of these shells were shipped there was notice given, then no license could apply after the giving of such notice, and as to all such shells shipped and received by the defendants after the giving of notice (if you find it was given) then the defendants would be liable as for a conversion."

It will be seen that as to this case the liability of defendants in error, if any, must be founded either upon their own knowledge, or upon the knowledge of Blake, that the license had been revoked. If the jury believed defendants in error that they had no knowledge that these shells came from these lands, and believed Blake that he had received no notice whatever from any landowner of objection to the taking of such shells, then no liability could be predicated upon the notice of June 30, 1914. The court submitted this issue to the jury, which resolved it against plaintiff in error.

[10, 11] Complaint is made that the court rejected the testimony of one Hickerson as to a conversation between Blake and one Figg, an agent of plaintiff in error. The following was the testimony offered and rejected: "I heard Mr. Blake and Mr. Figg talking, and I heard this man Figg tell Mr. Blake, he says: 'This has not scared me at all; buy all the shells you can get. I have been behind you and I am still behind you.'" This took place in 1915, long after the acts complained of had taken place. The court rejected this testimony upon the ground that no contention was made that Figg was a general agent, such as a vice-president, manager or president, with authority at all times to bind his principals, and that "the admissions of an agent after the res gestæ has passed away are no longer binding upon the alleged principal."

[12-14] Counsel for plaintiff in error did not question this statement of law and we think the ruling was sound. At a later stage of the trial plaintiff in error sought to introduce from the same witness statements alleged to have been made by Blake to Hickerson for the purpose of showing that Blake was the agent of defendants in error. This offer was rejected, as stated by the court, for various reasons. Blake had been on the stand and was not interrogated respecting it. It was therefore improper from the standpoint of impeachment. Furthermore, an agency of this nature cannot be established from the admissions of the agent himself. We think no error was thereby committed. Besides, as has been shown, the full capacity of Blake to bind defendants in error, in the situation presented, whether as agent or contractor, was properly submitted; therefore no prejudice could have resulted in any aspect of the case.

[15] It appears in evidence that one James Warren was an agent of plaintiff in error for the purpose of keeping squatters from the land, preventing theft of timber, and matters of that nature. Some time in 1912, Blake, desiring to get control of the banks of Little river, in order that he might prevent others from using them to prepare the shells for shipment, says he asked Warren if he could get a lease of the river or of the banks for that purpose. Warren said he did not know; that he did not think the shells would amount to anything. Negotiations between Blake and Warren are thus epitomized by Blake: "I told him in my estimation that the shells in the river there would amount to as much as the timber on the bank, and he began to laugh at me, and finally he said he thought he would be to the St. Louis Trust Company in a short time, and the next time I came to see him, he didn't know just exactly when he would go; he just kept putting me off, and finally I asked him again, and he said it would be impossible to get control of the water."

Counsel for plaintiff in error asked the court to charge that defendants in error were bound by the notice and charged with the knowledge acquired by Blake in 1912 of the failure of Warren then to obtain a lease for Blake from the landowners for the control of the business of digging shells; and error is assigned to the refusal of the court so to do. This position of counsel is untenable for many reasons. It is not shown that Warren submitted the proposition to plaintiff in error or his predecessors. Warren himself is not shown to have had much authority in the premises. If he had, and if he represented the owners in such capacity as to bind them, then his knowledge and acquiescence of itself would have been sufficient to establish the license in controversy. Warren himself evidently did not regard this musseling as constituting any invasion of the rights of the landowners. He considered it of little importance and even furnished teams with which some of the shells were hauled. Blake himself desired the lease, not as a grant of authority to dig the mussels, but as protection against competition from others engaged in the same pursuit. Defendants in error seriously contended at the trial that the knowledge and acquiescence of Warren should be imputed to plaintiff in error and his predecessors, but the court refused to entertain that view and charged the jury, favorably to plaintiff in error, that Warren's knowledge would not be plaintiff's knowledge unless Warren communicated the facts to the plaintiff or his assignors, concerning which the record is silent. It is clear, therefore, that plaintiff in error was favored rather than prejudiced

by the court's treatment of Warren's connection with the transaction.

We have been sensible of the protracted pendency of this litigation and the earnestness and sincerity of counsel, and have made a painstaking examination of record, arguments and briefs. Other errors assigned are minor in their nature and generally foreclosed by prior rulings and by those made upon the substantive questions presented. We find in the entire record no reversible error. The case was carefully and comprehensively submitted. The finding of the jury was for defendants in error upon all points, and the judgment accordingly must be

Affirmed.