# UNION NAVAL STORES COMPANY *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 80. Submitted December 20, 1915.—Decided February 21, 1916.

A claim of the United States for spirits of turpentine and rosin taken from government lands is not fatally defective because the crude and not the manufactured property was taken from the land, or because the land was described by the general description by which it was known, there being no other lands so known.

There being evidence from which the jury could form a reasonably certain estimate of amount of crude product taken by a trespasser from government land and the probable amount of manufactured product it would produce, *held* that defendant was not entitled to a peremptory instruction in his favor, or one to limit recovery to nominal damages, because the precise quantity was not shown.

Land entered by a homesteader remains public land of the United States for five years and until patent is issued, subject to the right of the homesteader to treat the land as his own, so far, and only so far, as is necessary to carry out the purposes of the act; and such purposes do not include boxing and chipping trees for the purpose of extracting turpentine or rosin for sale and profit.

Such boxing and chipping is not cultivation; and, as government publications have pointed out, seriously affects the value of the trees.

The Act of June 4, 1906, c. 2571, 34 Stat. 208 (Crim. Code, § 51), prohibiting the boxing of trees on government land for turpentine, rendered criminal that which prior to the passage of the act was actionable; and one conducting, with full knowledge of the facts, in 1904 and 1905, turpentine operations on government land under an unperfected homestead entry was a willful trespasser, and ignorance of the law does not excuse him.

Where, as in this case, the trespass was willful, the United States is not divested of its property, but is entitled to the product manufactured by a third person who knowingly purchased the same from the trespasser.

One knowingly taking property of another cannot, by changing its form or increasing its value, or commingling it with other property of his own, acquire title by accession.

The fact that the purchaser had a mortgage on the product, both crude and manufactured, of the trespasser, which contained an after-acquired property clause and covered a large amount of other property *held* not to affect the right of the United States to recover that part of the manufactured product which the jury found was derived from the crude article taken from government land.

One knowingly purchasing a manufactured article from a trespasser who converted the crude article, must account for the value as manufactured and can take no credit for the work and labor of the wrongdoer in manufacturing it.

202 Fed. Rep. 491, affirmed.

THE facts, which involve the liability of one who improperly converted turpentine and rosin from Government lands, are stated in the opinion.

*Mr. Richard W. Stoutz* for plaintiff in error.

*Mr. Assistant Attorney General Knaebel* for the United States.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an action by the United States against the Union Naval Stores Company for the conversion during the years 1904 and 1905 of spirits of turpentine and rosin alleged to have been taken by defendant from certain Government lands in the County of Mobile, in the State of Alabama, known as the Freeland Homestead, and thus and otherwise more particularly described in the complaint.

The facts, as they appeared at the trial, were as follows: Freeland had made an application for a homestead entry under § 2289, Rev. Stat., but never perfected it. Being the owner of other lands in the same neighborhood, Freeland agreed with one Rayford to give him a turpentine lease for a lump sum upon all of his timber, not including the homestead. A third party having been employed to reduce the agreement to writing, Freeland discovered that the homestead had been included, and he called Rayford's attention to this and tendered back the

check given for the consideration money, on the ground
that if the homestead was included in the lease he would
be in danger of losing his entry. Rayford replied: "There
is no law against turpentining a piece of homestead land
as long as you are on it." And so Freeland made no fur-
ther objection.

Rayford, during the years in question, conducted tur-
pentining operations upon the Freeland homestead and a
large number of other tracts in its vicinity. Under date
December 21, 1903, he had entered into a "shipping con-
tract" with the Union Naval Stores Company, by which he
undertook to cut and box at least 10 crops of 10,500 boxes
each from lands described in a deed of trust or mortgage
of even date given by him to one Wade as trustee of the
company, and to manufacture the crude turpentine into
spirits of turpentine and rosin, and deliver the manufac-
tured product at Mobile, Alabama, or other points selected
by it. By the same agreement plaintiff in error undertook
to advance moneys to be used by Rayford, and that it
would receive the manufactured turpentine and rosin and
sell it for Rayford's account at stipulated charges and com-
missions. The mortgage was given to secure the advances
and the performance of the shipping agreement. It
covered Rayford's turpentine leases, and also all crude
and manufactured spirits of turpentine, and other products
owned or in any manner secured by Rayford during the
continuance of the contract. The crude turpentine taken
by Rayford from the homestead was mixed with that taken
from his other properties at or before it reached the still;
and the manufactured products were shipped from time
to time to plaintiff in error at Mobile, bills of lading being
sent by mail, and accounts of sales being returned by
plaintiff in error to Rayford.

It was admitted that, during the years 1904 and 1905,
spirits of turpentine and rosin were received by plaintiff in
error from Rayford, under the contract and mortgage re-

ferred to, in quantities greater than those claimed for in the suit. There was evidence as to the market values of these products during the period in question, but none as to the market value of crude turpentine. A verdict and judgment having gone in favor of the United States for $2,447.55, defendant appealed to the Circuit Court of Appeals, where it was directed that so much of this as represented interest prior to the commencement of the action should be remitted, and the judgment otherwise affirmed. 202 Fed. Rep. 491.

There are numerous assignments of error, based upon exceptions taken at the trial, one of them to the refusal to direct a verdict in favor of defendant, the others to instructions given or refused to be given. Without reciting these in detail, we will express our views upon the principal questions of law that are raised.

Neither the complaint nor the evidence is fatally defective or uncertain. The claim is for spirits of turpentine and rosin taken from certain described lands. That it was the crude and not the manufactured product that was in a literal sense taken from the land is of no consequence. The land is referred to only to identify the chattels, conversion of which is alleged. Whether there was an error in the particular description of the lands, as is insisted, is a matter of no serious consequence, for they were otherwise described as the "Louis I. Freeland Homestead," and there was uncontradicted evidence that the lands referred to, and no others, were known by this description. That the evidence did not show precisely what quantities of turpentine spirits and rosin, manufactured from the crude turpentine taken from the homestead, were received by the plaintiff in error, was not ground for a peremptory instruction to find for defendant or to limit the recovery to nominal damages, since there was evidence from which the jury could form a reasonably certain estimate of the amount of crude taken from the homestead during the

years in question, and the amount of spirits and rosin that this probably yielded.

There was no error in charging that "the boxing of trees by a settler on public land covered by an unperfected homestead entry, or by any person who knew it was public land (which an unperfected homestead entry is), and the extracting of crude turpentine therefrom, constitutes in law an intentional, willful trespass, although he may have acted without knowledge of the illegality of the act, and that from such persons the United States are entitled to recover the value of the product manufactured from such crude turpentine by the settler, or from any person into whose possession the same may have passed." This refers, of course, as other parts of the charge clearly show, to a manufacture by Rayford, who was himself the trespasser.

The rights and privileges of an entryman with reference to standing timber were considered and discussed in *Shiver* v. *United States,* 159 U. S. 491, 497, 498, where, after reviewing the pertinent sections of the Revised Statutes, it was said: "From this résumé of the homestead act, it is evident, first, that the land entered continues to be the property of the United States for five years following the entry, and until a patent is issued; . . . third, that meantime such settler has the right to treat the land as his own, so far, and so far only, as is necessary to carry out the purposes of the act. The object of this legislation is to preserve the right of the actual settler, but not to open the door to manifest abuses of such right. Obviously the privilege of residing on the land for five years would be ineffectual if he had not also the right to build himself a house, outbuildings, and fences, and to clear the land for cultivation. . . . It is equally clear that he is bound to act in good faith to the government, and that he has no right to pervert the law to dishonest purposes, or to make use of the land for profit or speculation. The law

contemplates the possibility of his abandoning it, but he may not in the meantime ruin its value to others, who may wish to purchase or enter it. With respect to the standing timber, his privileges are analogous to those of a tenant for life or years. . . . By analogy we think the settler upon a homestead may cut such timber as is necessary to clear the land for cultivation, or to build him a house, outbuildings, and fences, and, perhaps, as indicated in the charge of the court below, to exchange such timber for lumber to be devoted to the same purposes; but not to sell the same for money, except so far as the timber may have been cut for the purpose of cultivation."

There is nothing in the letter or policy of the homestead act that permits the boxing and chipping of pine trees for the purpose of extracting turpentine for sale and profit. It cannot be regarded as cultivation within the meaning of the act; it affects the value of the inheritance too seriously for that. As is well known, the process requires the cutting of a deep gash or "box" into the side of the tree, so shaped as to catch and retain a considerable quantity of the crude gum, and repeated chippings thereafter, by each of which an additional portion of the bark is cut through to the wood so as to expose a fresh bleeding surface. It not only saps the vital strength of the tree and lessens its power to resist the force of the wind, but exposes the wood to decay and to wood-boring grubs and beetles; while the waste gum, being highly inflammable, increases the danger of forest fires. Government publications have repeatedly pointed out the ill effects of the practice.[1]

The recognition of these evils led Congress to pass the

---

[1] "A New Method of Turpentine Orcharding," Bulletin No. 40, Bureau of Forestry, 1903, pp. 9–13; "The Naval Stores Industry," Bulletin No. 229, Department of Agriculture, July 28, 1915; "Conservative Turpentining," Senate Doc. 676, 60th Cong., 2d Sess., Vol. 11, p. 498. See also 1 Land Dec. 607; 4 Land Dec. 1; 5 Land Dec. 389; 36 Land Dec. 302.

act of June 4, 1906, ch. 2571, 34 Stat. 208, now found in
Crim. Code, § 51 (act of March 4, 1909, ch. 321, 35 Stat.
1088, 1098). It is true that in *Bryant* v. *United States*
(1901), 105 Fed. Rep. 941, the Circuit Court of Appeals for
the Fifth Circuit, in holding that boxing for turpentine
was not a criminal offense within the meaning of § 246,
Rev. Stat., said, *obiter*, "We think it is not a matter of
common knowledge that such cutting and boxing of pine
trees destroy the value of the trees as timber, or that it has
a tendency even to retard the growth of the trees," and
that this view was made the basis of a decision by the
Circuit Court of Appeals for the Eighth Circuit that prior
to the act of 1906 the boxing of trees for turpentine on
public lands was not actionable. *United States* v. *Waters-
Pierce Oil Co.*, 196 Fed. Rep. 767, 769. We are clear,
however, that the act of 1906 only rendered criminal that
which before was actionable because not included in any
right or privilege expressly or by implication conferred
upon the homesteader by the act of Congress. So the
Circuit Court of Appeals for the Fifth Circuit held in
*Parish* v. *United States*, 184 Fed. Rep. 590. And see
*United States* v. *Taylor*, 35 Fed. Rep. 484.

Rayford, in conducting his turpentining operations upon
the homestead with notice that the land was the property
of the United States, became a willful trespasser, although
he may have supposed, as he is said to have declared, that
there was "no law against it." He acted with full notice
of the facts, and his mistake of law cannot excuse him.

Upon the facts as the jury must have found them, the
distillation by Rayford of the gum that was taken from
the Government's land was a continuing act of trespass
that did not divest the United States of its property but
left it still entitled to the manufactured products. *The
Distilled Spirits*, 11 Wall. 356, 369. If the doctrine of
confusion of goods were to be applied, the entire product
of the still would belong to the United States. , *The*

"*Idaho*," 93 U. S. 575, 586.   But by the instructions of the trial judge recovery was limited to the value of the products manufactured from crude gum taken from the Freeland Homestead.

It is ingeniously argued that a different rule must govern as between the United States and the defendant company, because the company had a mortgage upon Rayford's product, both crude and manufactured; that the crude stuff as soon as it reached the still was inextricably mixed with a much greater quantity to which Rayford had an unquestioned title which passed to defendant at once by virtue of the mortgage, and that the evidence shows such hopeless confusion and admixtures of unknown quantities and varying qualities of gum that no reasonable ascertainment of the rights of the parties as tenants in common is possible; therefore, the Government property, being relatively small in value, passed to defendant under the doctrine of accession.   It is less confidently argued that the same result would apply even as between the lawful owner and a willful trespasser; but this we deem clearly untenable.   One who knowingly takes the property of another cannot, by changing its form or increasing its value, or by commingling it with other property of his own, acquire title by accession.   *The Distilled Spirits, supra; Silsbury* v. *McCoon,* 3 N. Y. 379; 53 Am. Dec. 307, 315, *note.*

The argument based upon the mortgage is confronted with this obstacle, to say nothing of others: that the mortgage and the shipping contract alike contemplated that Rayford should manufacture the crude turpentine into spirits and rosin and ship these to defendant, and such was the actual course of dealing thereunder.   Defendant at no time asserted any lien upon or property in the crude material by virtue of the mortgage.   And even if it were now permitted by a fiction to assert ownership in all that part of the crude gum which was the lawful property

of Rayford, as of the time that it reached his still, it must perforce place itself in the position of employing Rayford as its agent for the purpose of distilling the turpentine. Now Rayford, in doing this, placed with it a comparatively small, but still substantial, quantity of crude turpentine that was the property of the United States. Defendant cannot take a benefit from the distilling operations thus conducted by Rayford without at the same time assuming a responsibility for that which he did; and what he did in distilling the Government's gum was a continuing trespass, that left the United States entitled to its property in its changed form, the same if the distilling was done by Rayford under an agency from defendant, as if done on his individual account.

And of course, if defendant's title dates from the time of the delivery to it of the manufactured product, it can take no greater interest than that which Rayford held.

Thus, whether we indulge the fiction, or whether we adhere to the practical fact, which is that Rayford under the contract delivered manufactured products to defendant, the latter can take no credit for the work and labor bestowed upon the turpentine by the wrongdoer, but must answer for its value as manufactured products. *Wooden-ware Co.* v. *United States,* 106 U. S. 432, 435; *Guffey* v. *Smith,* 237 U. S. 101, 119.

The after-acquired-property clause in the mortgage does not help matters for defendant. Property in the turpentine could not be acquired by Rayford without the consent of the United States, and this he did not have. See *Holt* v. *Henley,* 232 U. S. 637, 640; *Detroit Steel Co.* v. *Sistersville Brew. Co.,* 233 U. S. 712.

It is insisted that if a tenancy in common existed in the manufactured product, the possession of it by defendant company was not tortious, and that in order to show a conversion there must be either a demand for possession and refusal thereof, or a showing that some

disposition was made of the chattels inconsistent with and destructive of the rights of plaintiff as co-tenant. But, taking the shipping contract and the mortgage with the testimony and admissions as to the course of business carried on thereunder, the jury was fully warranted in finding that defendant had converted the manufactured products by selling them soon after they were received, and accounting to Rayford for the proceeds. The question of conversion was submitted to the jury, with a proper instruction that in such event a demand for possession was futile and therefore unnecessary.

The trial court instructed the jury that recovery should be based upon the market value of the spirits and rosin at the time they were received by defendant, and it is insisted that the value at the time of the conversion ought to have been taken instead. As to this it is sufficient to say that, except as it was to be inferred that probably the manufactured products were sold not long after their receipt by defendant, there is nothing to throw light upon the time that intervened between receipt and sale; and while by stipulation the highest and lowest market prices for turpentine and for rosin during the years 1904 and 1905 were shown, it did not appear at what time the prices were high, and at what time low. In short, the evidence contained nothing to aid the jury in distinguishing between the market price at the time of receipt and the market price at the time of sale. Defendant did nothing—if it could—to elucidate the matter by evidence, nor did its exceptions call the attention of the trial judge to the point now insisted upon.

Minor points are raised, but none that seems to call for discussion.

*Judgment affirmed.*


MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.