Gribben, Appellant, *v.* Carpenter et al.

244

Argued April 8, 1936. Before KEPHART, C. J., SCHAF-FER, MAXEY, DREW, LINN and STERN, JJ.

*J. I. Hook*, of *Scott & Hook*, with him *Rufus S. Marriner*, of *Marriner & Wiley*, for appellant.

*E. C. Higbee*, of *Higbee, Matthews & Lewellyn* and *William J. Kyle*, of *Kyle & Reinhart*, with him *J. E. Isherwood*, of *Smith & Isherwood* and *H. C. Sayers*, for appellees.

OPINION BY MR. JUSTICE DREW, June 26, 1936:

On July 5, 1895, John Orndoff executed an oil and gas lease on a tract of approximately 435 acres in Greene County to T. J. Vandergrift. By 1898, after successive assignments, the lease, which was limited to a term of 25 years, became vested in the Natural Gas Company of West Virginia. The lessor died testate in 1914. In his will the leased tract was divided into three parts; the

first part was devised to his son, Oscar F. Orndoff; the second part was given to another son, John B. Orndoff; the remaining parcel was devised to Jessie O. Smith and Lloyd M. Smith, minor children of a deceased daughter, Jessie Orndoff Smith. Oscar was appointed testamentary guardian of the testator's grandchildren. Lloyd M. Smith died intestate, unmarried and without issue in 1917; his father and his sister were his only heirs. Subsequently, the father quitclaimed and released all of his right, title and interest in the lands to his daughter Jessie, who thus became the sole owner of the tract which had originally been devised by her grandfather to her brother and herself.

As the end of the term approached, there were two producing wells on the original tract, one on Jessie's land, by far the better of the two, and one on John's parcel. There was no productive well on Oscar's tract. Prior to the expiration of the lease on July 5, 1920, the Natural Gas Company of West Virginia made offers to John and Oscar in an effort to secure a renewal or extension of the lease. All such offers were refused. On the other hand, John entered into negotiations looking toward the acquisition of the company's equipment and material in the two wells, as a result of which, shortly before the expiration of the lease, the equipment was purchased by Orndoff Brothers, a partnership composed of John and Oscar, formed for the purpose of operating for gas and oil. Two days after the expiration of the original lease, Oscar, as guardian of Jessie, executed a lease of her land to John. It was clearly understood, however, that the lease was for the use of Orndoff Brothers, the partnership. At the same time Oscar and John executed similar leases of their respective tracts to their partnership.

In due course Oscar presented his petition to the orphans' court for the approval and ratification of the oil and gas lease executed by him in his fiduciary capacity. The petition stated that the casing, tubing, material and

appliances in and about the well on the minor's land were the property of John B. Orndoff, when in fact they were the property of the partnership. Similarly, no information was given to the court that the lease was really being taken for the use of the partnership and not for the sole use of John. In other words, Oscar concealed the fact that he was on both sides of the transaction, both as lessee and as lessor. His affidavit to the petition failed to comply with the rules of court in that it did not state that he was neither directly nor indirectly interested as lessee of the lands. The order of court ratifying and approving the lease directed the guardian to give bond in a certain sum and provided for the approval of that bond by the court. The bond was never executed, approved or filed. At the time of the execution of the lease on the minor's behalf, on July 7, 1920, the prevailing price paid by gas companies purchasing gas in Greene County was sixteen cents to twenty cents per thousand cubic feet at the well, and the contracts for the sale of the gas which the partners subsequently entered into called for such prices. Under the terms of the lease that was executed by her guardian, however, the minor was to receive but one and one half cents per thousand cubic feet.

Jessie O. Smith, then a student at Northwestern University, in Evanston, Illinois, attained her majority on October 28, 1922. Six days later her guardian went to the home of Dr. B. H. Orndoff, his brother and her uncle, in Chicago, and requested her to meet him there. She was given a check in an amount that purported to represent the full value of her estate. Simultaneously with the receipt of the check she executed a release to her uncle. The whole interview consumed very little time.

Early in 1923 B. N. Freeland was appointed receiver of all the assets and property of Orndoff Brothers. As such he entered into agreements for the sale of the gas that was being produced by the wells, and from 1923 to 1926 Jessie received from him royalty checks represent-

ing the amount due to her under the lease executed by her guardian before she became of age. In the meantime, on August 8, 1925, Oscar died. The present bill in equity to set aside the lease of July 7, 1920, and for an accounting of the proceeds and profits received from the sale of gas during the intervening years was filed by Jessie, now the wife of Clyde A. Gribben, on February 17, 1927. Named as defendants were the personal representative of Oscar F. Orndoff, John B. Orndoff, B. N. Freeland, the receiver of Orndoff Brothers, and the Natural Gas Company of West Virginia. The latter was not a necessary party and it was subsequently stricken from the record as a party defendant.

The case came on for hearing in 1931. Voluminous testimony was taken. The material findings of fact, all of which are amply supported by the evidence, have already been outlined. The chancellor further found that plaintiff was not advised of the expiration of the original lease, that she was not told of the arrangements made by her uncles, that she did not know that there was a producing gas well on the tract of land devised to her by her grandfather, and that she did not discover these facts until on or after a consultation which she and her husband had with B. N. Freeland, the receiver, on February 27, 1926. Following this interview plaintiff made the investigation which led to the filing of the present bill approximately one year later. The chancellor concluded that Oscar and John had conspired and colluded by manipulating, controlling and managing the leasing of plaintiff's land and a valuable producing gas well thereon, so as to deprive and defraud her of a valuable lease and the large sums of money that it would produce. It was his conclusion that the Orndoff brothers were thoroughly familiar with the value of plaintiff's well, that they saw the opportunity to secure the income therefrom for themselves, and that their conduct in permitting the original lease to expire, in purchasing the lessee's equipment, and in subsequently bringing about the

execution of the new lease of plaintiff's tract, was with a view to the accomplishment of that purpose. It may be conceded that plaintiff's royalty was slightly increased under the new lease. On the other hand, the lease executed by the guardian was the lease of a producing well; it was not an ordinary oil and gas lease, such as was the original lease, wherein the lessee assumed the risk of finding oil and gas and paid all the expenses of drilling and operating. As was said in the discussion accompanying the chancellor's findings, "In the face of such palpable fraud it seems almost useless to discuss the law of this case." Our review of the evidence leads us irresistibly to the conclusion that the guardian and his brother were joint participants in a scheme which was not only fraudulent as a matter of law, but which was fraudulent in fact, the result of conscious planning on the part of the guilty parties.

The defense relied mainly upon ratification, estoppel and laches. In this respect the chancellor found that the release was, in view of the conditions under which it was obtained, unavailing, that plaintiff was not, by the periodical receipt of checks or by any other circumstances, put upon notice of any improper conduct on the part of her uncles, and that she filed her bill promptly after she had reason to believe that a fraud had been perpetrated upon her. Accordingly, a decree was entered cancelling the lease and ordering defendants to account. Exceptions were filed by defendants. These exceptions were pending when defendants petitioned the court for a rehearing on the ground of after-discovered evidence. A rehearing was granted.

Defendants' evidence upon the reopening of the case was almost entirely confined to proof of plaintiff's contemporary knowledge of the change in the management and operation of her well in an effort to demonstrate her laches. As a result of the evidence that was produced the chancellor made changes in his findings and conclusions, having now become persuaded to the view that

plaintiff was barred from maintaining her bill. Remaining steadfast in his former findings with respect to the fact of fraud, he nevertheless found that plaintiff was aware of the time of expiration of the original lease sometime before its actual termination, and that she knew, before she became of age, that a new lease had been executed and that Orndoff brothers were operating 'a well that was on her land. He found that in 1923 she "did know or should have known" that Orndoff brothers and their receiver had been selling gas for from sixteen cents to twenty cents per thousand cubic feet at the same time that they were paying her only one and one-half cents per thousand cubic feet. Without being definite as to just what were the suspicious circumstances, if any there were in fact, he found that "she had sufficient notice that a fraud had been perpetrated," that she "had enough information and knowledge of the facts," that "she should have made further inquiries within two years after she became of age," and that "she did not make proper effort to ascertain the facts within a reasonable time under the circumstances of the case and the facts as they now appear." He concluded that plaintiff was guilty of laches and dismissed the bill. Plaintiff's exceptions to the substituted findings and decree were dismissed and the present appeal was taken.

There is nothing in the record to support the chancellor's vague conclusions with respect to plaintiff's lack of diligence. We fail to see wherein there is any sufficient basis in the evidence to support a finding that plaintiff was barred by her own laches. Following her mother's death plaintiff made her home with a relative in West Virginia. Moreover, during the years between 1918 and 1925 she was away at school, spending all but one year at different schools in Illinois. The short vacations were spent, not in Greene County, but at her home in West Virginia, or other places. The property rights of a young college student, away at school, were at the mercy of her guardian and his brother, her uncles, both astute

business men whose familiarity with her property and its future was directly in proportion to her ignorance thereof. She was certainly entitled to assume the honesty of the guardian who stood in such a close family relationship and who had been in charge of her property for so many years. She was under no duty to assume his dishonesty and to investigate his management of the trust. Such an obligation could only arise upon a showing of circumstances sufficient to put her upon reasonable notice of wrongdoing, and, prior to plaintiff's interview with the receiver in 1926, there were no such circumstances in the present case.

Assuming the reliability of the testimony that was introduced upon the rehearing, we nevertheless look in vain for evidence of laches upon plaintiff's part. Taken at its best, that evidence goes no further than to show that she knew the original lease had expired, that her uncles were operating the well, and that she had expressed her approval of the fact that they were managing it. This was merely illustrative of the trust which she justifiably, but unfortunately, reposed in her guardian. There was certainly nothing to arouse suspicion. The chancellor's substituted findings fix upon no suspicious circumstances. His findings that she was guilty of laches are not borne out by the record. They cannot prevail. A chancellor's findings which are not supported by the evidence, or which are based upon inferences erroneously taken, will not stand: *Pa. Knitting Mills v. Bayard,* 287 Pa. 216; *Kirmse v. Adler,* 311 Pa. 78; *Elliott's Est.,* 312 Pa. 493.

Defendants have within their grasp all the benefits they derived by virtue of their frauds. The delay has resulted in no injury to themselves nor has it prejudiced their interests in any way. Delay which injures no one will not furnish reason for refusing relief: *Kinter v. Commonwealth Trust Co.,* 274 Pa. 436; *Patton v. Commonwealth Trust Co.,* 276 Pa. 95, and *Bangert v. Provident Trust Co.,* 314 Pa. 442, relied upon by defendants,

are all cases in which the deaths of important witnesses were clearly prejudicial. Such is not the present case. Oscar F. Orndoff, had he been alive, could not very well have denied or explained away the doubtful circumstances surrounding the execution of the new lease, the securing of its approval by the Orphans' Court, the disproportionate price paid plaintiff when compared to the price which the brothers were to obtain, and the private settlement with plaintiff abruptly upon the attainment of her majority. John B. Orndoff was thoroughly familiar with all of the transactions undertaken by himself and his brother, and this witness testified at great length.

There is, of course, no merit in defendants' contention that the order of the orphans' court approving the guardian's lease is being subjected to improper collateral attack. A judgment or decree that has been fraudulently obtained has always been exempt from the operation of that rule: *Mitchell v. Kintzer,* 5 Pa. 216; *Phelps v. Benson,* 161 Pa. 418.

What disposition shall be made of the present appeal? Defendants contend that their exceptions to the original findings, conclusions and decree have not been disposed of, and that if this court should be of the opinion that plaintiff is not barred by laches, the record must nevertheless be remitted to the end that those exceptions may be disposed of after argument before the court in banc. We think any such procedure would serve no useful purpose. Once the defense of laches is put aside, there is no reason for further delay in according plaintiff the relief to which she is clearly entitled. After the rehearing, and again in disposing of plaintiff's exceptions, the chancellor, upon "a reconsideration of the whole proceeding," reiterated his prior findings of fraud. These findings are amply supported by the evidence and they are therefore binding on this court. More than the equivalent of an argument upon defendants' exceptions to the original findings, conclusions and decree has been had, and the record will be remitted for the entry of an appropriate

decree, cancelling the lease and ordering an accounting.

There remains only the question of the measure of damages. Under the terms of the original adjudication defendants were found to have "wilfully and fraudulently commingled and confused" the gas produced by plaintiff's well with that from the well on the John B. Orndoff tract. The chancellor concluded that defendants must therefore "account to plaintiff for all gas produced and sold from both wells." He nevertheless set the "damages or value of plaintiff's gas . . . at seventy (70) per centum of the value of the gas sold from both wells," this figure being based upon plaintiff's expert testimony as to the probable percentage that had been produced by her well. Plaintiff argued that the measure of damages applied was improper in the light of the chancellor's finding that defendants were guilty of fraudulent confusion, and that she was entitled, under such a finding, to the full proceeds from the sale of gas from both wells. We think her position is sound. Since defendants willfully and fraudulently commingled and confused the gas produced by the two wells, the measure of damages is the value of all the gas that was produced: *Stone v. Marshall Oil Co.*, 208 Pa. 85. This result must necessarily follow from the fact that it is impossible to ascertain, with any degree of certainty, the volume produced by plaintiff's well. To prevent the possibility of injustice to the innocent party the wrongdoers must forfeit whatever fraction might have been produced by the well on the John B. Orndoff tract.

Defendants were trespassers (cf. *Restatement, Torts,* sections 158, 167, 173) and are therefore not entitled to compensation or credit for labor or for any expenditures for fixtures or equipment, either in the acquisition or maintenance of plaintiff's well.

The decree appealed from is reversed, and the record is remitted to the court below for the entry of a decree in accordance with the views herein expressed; costs to be paid by appellees.