## MOOERS v. RICHARDSON PETROLEUM CO. et al.

### No. 11593.

Court of Civil Appeals of Texas. San Antonio.

June 26, 1946.

Rehearing Granted Sept. 25, 1946.

Rehearing Denied Dec. 4, 1946.

Johnson & Rogers, of San Antonio, Cantey, Hanger, McMahon, McKnight & Johnson, Carlisle C. Cravens, Jack C. Wessler, and Gillis A. Johnson, all of Fort Worth, for appellant.

Tarlton & Koch, of Corpus Christi, Small, Arney & Small, of Austin, and Vinson, Elkins, Weems & Francis and Tarlton Morrow, all of Houston, for appellees.

MURRAY, Justice.

This suit was instituted in the District Court of Midland, Texas, on June 4, 1942, by Clifford Mooers against Richardson Petroleum Company, a corporation domiciled in Nueces County, seeking to recover for an interest in oil illegally run from an oil and gas lease located in Nueces County, covering the west ⅓ of Lot No. 40, containing 10.46 acres in the H. B. Sheppard Farm Lots, said 10.46 acres being fully described in the petition and hereinafter referred to as the "Erigan Lease." He alleged that he owned one-half of the minerals in place lying under the 10.46 acres subject only to the oil and gas lease under which defendant was operating. Plaintiff asked for an accounting and for a foreclosure of a lien upon the lease to secure his claim.

Richardson Petroleum Company filed a plea of privilege to be sued in Nueces County, which plea was sustained. On December 18, 1944, plaintiff filed his second amended original petition upon which he went to trial.

The Quiros Lease, covering about 80 acres of the H. B. Sheppard Farm Tracts, and fully described in the petition, was brought into the suit and it was also charged that illegal oil had been run from the Quiros Lease. Plaintiff asked for damages, both actual and exemplary, for an accounting and for a cancellation of the Erigan Lease and the assignment of the Quiros Lease.

The trial was before the court without the intervention of a jury and resulted in judgment in favor of Mooers in the sum of $32,002.38 actual damages, and $10,000 exemplary damages. All other relief prayed for was denied. The First National Bank of Chicago and the Republic Supply Company were parties to the suit, but all relief against them was also denied. Clifford Mooers alone has prosecuted this appeal.

The trial court made and filed findings of fact and conclusions of law. Appellant requested other, further and amended findings which were refused by the court.

Appellant's main complaints on this appeal may be summed up as follows:

1. The failure of the court to cancel or terminate the assignment of the Quiros Lease.

2. The failure of the court to cancel or terminate the Erigan Lease and assignment.

3. The failure of the court to grant a recovery against the First National Bank of Chicago.

We think it would be well to here give a complete statement of the case.

In November, 1935, Shasta Drilling Company assigned an undivided one-half interest in the adjoining Erigan and Quiros Leases to W. A. Richardson and James G. McCarrick. These assignees organized the Richardson Production Company, Inc., which operated the properties until January, 1937, when it was succeeded by the Richardson Petroleum Company. Appellant, Clifford Mooers, has succeeded to all titles and rights formerly owned by Shasta Drilling Company. The consideration for the assignment of the two leases was an oil payment of $30,000, to be paid out of one-eighth of seven-eighths of the oil produced from the lease. In other words, Shasta Drilling Company, or its successor, Mooers, retained a one-eighth overriding royalty until the sum of $30,000 was paid. In addition to this Mooers was the holder of a one-sixteenth royalty of the Erigan Lease, but had no royalty interest in the Quiros Lease. At the time the leases were assigned there was an oil well on the Erigan known as Erigan No. 1, and one oil well on the Quiros, known as the Quiros No. 2. Quiros No. 1 was thought to be a dry hole. The assignment required the reworking of these two oil wells. This was done and Erigan No. 1 was made into an excellent oil well but the reworking of Quiros No. 2 was not so successful and was completed as a gas well. The gas was not saved and marketed but was blown into the air. W. A. Richardson, as manager of the lessee company, at once began a systematic stealing of oil from the Erigan Well; a. four inch pipe was laid from Erigan 1 to Quiros 2, and thus it was made to appear that Quiros 2 was a producing oil well. The allowable for both wells was in fact run from Erigan 1. Pipes were also laid

from Erigan 1 to the Harrell and Sedwick leases and oil from Erigan 1 was used to make up the production allowed the wells on these two leases. This systematic running of hot oil from the Erigan was kept up over a period of some five years, when it was discovered by Federal Agents and the pipes dug up and disconnected. The line from Erigan 1 to Quiros 2 was so well concealed that it was not discovered until some time after the other hot oil lines had been dug up. All of the hot oil was not run from Erigan 1, but later, when there were producing wells on the Quiros Lease, hot oil was run from these wells to the Harrell and Sedwick Leases.

Clifford Mooers had no knowledge of the running of this hot oil from the Erigan Lease and, of course, was not paid his one-sixteenth royalty on this oil. One Erigan owned the other one-sixteenth royalty on the Erigan and did know of the illegal oil and did receive royalty payments upon the same.

By June 8, 1937, the $30,000 oil payment had been made and a release in full had been executed. There is no accurate or complete record as to just how much of this illegal or "hot oil" was run from the Erigan. The oil from the several wells and leases was of different specific gravity and therefore of different value, and these oils of different value were commingled and, as thus commingled, run into pipe lines and sold.

The trial judge made, among others, the following findings of fact:

"Upon obtaining the above assignment, McCarrick and Richardson assigned the leases to Richardson Production Company, a corporation, in which both owned stock, and of which Richardson was president and manager. Soon thereafter Richardson, as manager of the Company, began re-working Erigan No. 1, which resulted in production of oil in substantial quantities, and continued to so produce up to the time of the trial. The workover rig was then moved to the Quiroz No. 2, and the attempt at production resulted in a gas well. Its allowable was made up from Erigan No. 1. In May, 1936, the well was producing a fine spray of oil and making about 25 to

27 barrels per day, the balance of the allowable being made up from Erigan No. 1. The well ceased producing any oil in the latter part of June, 1936, and in July, 1936, the sand cut off a wing of the Christmas tree, and, after another Christmas tree was installed about September 1, 1936, the well 'blew in,' as a good oil well and since that time the well has produced oil in commercial quantities."

"4. Two other wells were later drilled on the Erigan tract and up to June 1, 1942, the total reported production from the Erigan tract was 293,703 barrels of oil and 197,760 barrels of distillate, for which Shasta and its assigns received one-half of the royalty.

"5. The dry hole drilled by Shasta on the Quiroz tract was reworked into a good oil well and thirteen additional wells were drilled thereon by Richardson, resulting in the production of oil and/or distillate. Shasta and plaintiff had no interest in the royalty as to the Quiroz lease, and the covenants with respect to production from said lease were placed therein as an incident to the production payment.

"6. The $30,000.00 production payment due under the assignment from Shasta was completely paid off by June, 1937, out of the production reported from the Erigan and Quiroz leases, and Shasta executed a release of the reserved payment.

"7. After the assignment by Shasta both the Erigan and Quiroz leases were developed and operated in a workmanlike manner, the provisions of both the leases and the assignment were substantially complied with and no physical damage to the mineral estate resulted therefrom.

"8. Neither Richardson nor McCarrick withheld material facts from Shasta in obtaining the assignment of November 1, 1935 and there was no antecedent conspiracy to produce and operate the leases in an illegal manner.

"9. There was no intent on the part of Richardson and McCarrick at the time they acquired the leases in question to use the same as a basis for the production of oil in excess quantities or the transportation of oil therefrom to other leases. Whatever was done in that particular was at the instance of Richardson or under his direction, without the knowledge of McCarrick.

"10. Soon after Erigan No. 1 well was recompleted and brought into production in paying quantities, and after Quiroz No. 2 well was reworked and was producing gas and did not make its oil allowable, W. A. Richardson made an agreement with N. Erigan to take oil in excess of the legal allowable from Erigan No. 1 well and to pay him double royalty. Pursuant to this secret agreement, Erigan received his regular monthly royalty from the pipe line company and each month Richardson Production Company also paid him a similar amount as double royalty. This arrangement was discontinued early in 1937, after twelve such payments were made.

"11. During the time, beginning with December, 1935, and ending with March, 1941, oil in excess of the legal allowable was produced and secretly removed from the Erigan lease. This practice was inaugurated by Richardson Production Company and continued by Richardson Petroleum Company. The legal production from the Erigan lease was run and sold to a connecting pipe line and the illegal oil (that produced in excess of Railroad Commission allowables) was secretly moved to other leases of the Company and reported as production from such leases. Plaintiff and his predecessors received royalty on all oil run to the pipe line, but on the illegal oil moved from the Erigan lease to other leases plaintiff has received no royalty. No accurate records were kept of all of the illegal oil taken from the Erigan lease upon which no royalty has been paid to plaintiff, but, taking into account the evidence as to the character of wells on the leases to which illegal oil was run and commingled from the Erigan lease, and the amount of oil the wells on the Erigan lease were capable of producing, the amount of illegal oil so run from the Erigan lease can be determined with reasonable certainty, by resolving the benefit of doubt in favor of the plaintiff in those instances where no records were kept and in those instances where only partial records were kept, so as to fully compensate plaintiff and prevent defendant Richardson Petroleum Company from benefitting by the illegal acts

incident to the illicit production and commingling of oil from the Erigan lease. The amount of excess oil produced and run from the Erigan lease and the sum of money due plaintiff for his one-sixteenth portion of the value of such oil, based on the highest intermediary market value during such time, amounts to $32,002.38. This amount, together with the amount of $10,000 exemplary damages, will fully compensate plaintiff for all damages sustained on account of the excess oil run and commingled from the Erigan lease. By the payment of this sum, Richardson Petroleum Company will not have benefitted by such illegal production of oil.

"12. This suit was filed in Midland County, Texas, on sworn pleadings on June 2, 1942. Plea of privilege having been sustained, the cause was transferred to this Court. No notice was given of any intention to undertake to exercise any right of reentry or forfeiture under the assignment as to either the Quiroz or the Erigan lease until approximately one year after the suit had been instituted in Midland County for the recovery of debt. Plaintiff caused lis pendens notice to be filed in Nueces County on June 10, 1942, for the purpose of giving notice of his precise claim, after plaintiff had learned of a prospective purchase by The Chicago Corporation of the capital stock of Richardson Petroleum Company. Plaintiff continued to rely upon his right as a royalty owner under the Erigan tract and made no change of position for substantially a year after filing suit, during which time Richardson Petroleum Company continued to produce oil as lessee and to pay royalty to plaintiff. Plaintiff continued to collect royalty under the Erigan lease at all times up to the trial.

"13. Conflicting evidence was offered with respect to the question of damage to the Erigan lease by virtue of the production of excess oil therefrom. From such conflicting evidence I conclude that said Erigan lease has not been damaged by reason of such excess production.

"14. Early in January, 1937, Richardson Petroleum Company, defendant herein, was organized. The defendant Company acquired the assets of Richardson Production Company which included the Erigan and Quiroz leases and leases known as the Harrell, the Sedwick and various other leases. On January 14, 1937, the present defendant borrowed from the First National Bank of Chicago $1,805,000.00, and thereafter additional sums to take up and extend a portion of the original indebtedness and additional monies for the development of the Richardson Petroleum Company properties as follows:

"(a) Loan of $3,500,000.00 under contract of loan dated August 20, 1937.

"(b) Extension thereof, dated July 20, 1938.

"(c) Extension thereof, dated November 1, 1938.

"(d) A loan of $1,280,000.00 under contract of loan dated May 20, 1941.

"(e) A loan of $330,000.00 under supplemental contract of loan, dated November 1, 1941.

"(f) A loan of $1,941,000.00 under contract of loan dated June 8, 1942.

"(g) Final loan of $700,000.00 made under supplemental loan agreement dated April 10, 1943.

"Each of said loans was secured by a deed of trust lien upon oil and gas leases of Richardson Petroleum Company, including the Erigan and Quiroz leases and also what are known as the Sedwick and Harrell leases, and an assignment of the proceeds of oil runs to be produced from said leases. Under said arrangement as to oil runs, pipe line companies were directed to make remittances to the bank, whereupon the bank credited said runs to the account of Richardson Petroleum Company, charging against the same the accruals on principal and interest of said loan currently accruing and crediting the balance to the account of Richardson Petroleum Company. This arrangement continued until the first of June, 1942, at which time the Chicago Corporation acquired all the capital stock of Richardson Petroleum Company, and after which time oil runs were paid direct to Richardson Petroleum Company who out of their account made payments upon the lien indebtedness due said bank.

"The bank was not made a party defendant in this cause until the filing of the First Amended Original Petition on May

11, 1944, at which time the relief prayed against said bank was that the lien of said bank be declared to be subject to and inferior to the rights of the plaintiff.

"In connection with the deeds of trust taken by said bank, said deeds of trust enured also to the benefit of the Republic Supply Company, which from time to time sold to Richardson Petroleum Company large items of oil well supplies, and said Republic Supply Company was not made a party defendant until May 11, 1944.

"In the Second Amended Original Petition additional relief against said Bank and said Supply Company (was prayed for), as is shown by the pleading.

"The First National Bank of Chicago and Republic Supply Company were both lienholders in good faith and for a valuable consideration. Neither had any knowledge or notice of the wrongdoing of Richardson Petroleum Company or its predecessors in title."

Appellant's first contention is that the trial court erred in not granting him a cancellation of the assignment of the Quiros lease, whereby he transferred his one-half interest in the seven-eighths working interest of this lease to Richardson and McCarrick, who, in turn, transferred it to the Richardson Production Company, Inc., and finally becoming the property of the Richardson Petroleum Company, a successor corporation to the Richardson Production Company, Inc.

The assignment of the one-half of the seven-eighths working interest of the Erigan and Quiros Leases contained the following provision:

"There is hereby excepted and reserved to Shasta Drilling Company, its successors or assigns, 1/8th of 7/8ths of all oil and/or gas produced and saved from said leased premises, or any part thereof, covered by this assignment, if, as and when produced and saved, but not otherwise, until Shasta Drilling Company has actually received from the proceeds thereof the sum of Thirty Thousand Dollars."

The assignment contains certain stipulations with reference to production, including paragraph 6, which reads as follows:

"6. If production from the Quiroz No. 2 well ceases for a period of thirty (30) days, and assignees, their heirs, executors, administrators or assigns, are not actively engaged in drilling a well or wells on said lease, or are not actively engaged in reworking the Quiroz No. 2 well, then in that event the undersigned shall at its option, have the right to forfeit the Quiroz leasehold estate herein granted, and upon a declaration in writing of such forfeiture, the Quiroz leasehold estate herein assigned, shall, ipso facto, revert to and become vested in the undersigned."

The trial judge held, and we think properly so, that "Shasta and plaintiff had no interest in the royalty as to the Quiros lease, and the covenants with respect to production from said lease were placed therein as an incident to the production payment." Some eighteen months after the assignment was executed the oil payment of $30,000 was completed and fully paid. Appellant executed a receipt in full and Richardson and McCarrick and their successors in title to the 7/8ths working interest became absolute under the terms of the assignment.

Appellant contends that inasmuch as he had a mineral deed to one-half of the minerals under the Erigan Lease, as well as a one-sixteenth royalty interest, he had an interest in seeing that there was prompt development on the adjoining Quiros Lease. However, when the oil payment was made in full the title of appellees to the working interest became absolute.

Appellant says that if he had known of the fraud of Richardson in running oil illegally and secretly from the Erigan to the Quiros he would not have accepted the $30,000 as the oil payment, and would have demanded that his one-sixteenth royalty be first paid. No doubt this is true, but the fact remains that he did accept the oil payment and thereby made the title of appellees absolute in the Quiros Lease. He has a right to suit for the fraud perpetrated upon him, but he can not now declare a forfeiture as of the date he would have done so but for the fraud of Richardson. The rights of many third parties are now involved. The Chicago Bank has advanced large sums of money; new stockholders

have purchased stock in the Richardson Petroleum Company; a supply company has furnished much equipment. This does not mean that Richardson will be permitted to profit by his fraud at the expense of appellant. The trial judge, in finding for Mooers in the total sum of $42,002.38, found "that these amounts fully compensate plaintiff for all damages he has suffered and will prevent the wrongdoer from gaining any benefit by reason of its wrongdoing."

■ Appellant contends that the illegal manner in which the Erigan Lease was handled entitles him to a cancellation of that lease. There can be no doubt but that Richardson, as president and general manager of the two operating corporations, stole oil in large quantities from the Erigan Lease without paying Mooers the one-sixteenth royalty to which he was entitled. There was no provision in either the lease or the assignment providing that the running of oil in excess of the amount allowed by the Railroad Commission, or the failure to pay royalty upon such oil, should be cause for forfeiture of the lease. Such a provision could have been written into the lease but it was not. In the absence of such a provision in the lease the running of hot oil from the lease is not grounds for forfeiture. Grubb v. McAfee, 109 Tex. 527, 212 S.W. 464; Stitz v. Nat. Producing & Ref. Co., Tex.Civ.App., 247 S.W. 657; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Leonard v. Prather, Tex.Com.App., 36 S.W.2d 216, 86 A.L.R. 499; Cole Pet. Co. v. U. S. Gas & Oil Co., 121 Tex. 59, 41 S.W.2d 414, 86 A. L.R. 719.

Appellant next contends that inasmuch as oil was illegally run from the Erigan Lease and commingled with oil supposedly produced from the Quiros, Harrell and Sedwick Leases, that he should be permitted to recover a one-sixteenth royalty from all of this oil reported as produced from all of such wells, because the wrongdoer is unable to unscramble the mass. The trial judge found as follows:

"No accurate records were kept of all of the illegal oil taken from the Erigan Lease upon which no royalty has been paid plaintiff, but, taking into account the evidence as to the character of wells on the leases to which illegal oil was run and commingled from the Erigan Lease, and the amount of oil the wells on the Erigan Lease were capable of producing, the amount of illegal oil so run from the Erigan Lease can be determined with reasonable certainty, by resolving the benefit of doubt in favor of the plaintiff in those instances where no records were kept and in those instances where only partial records were kept so as to fully compensate plaintiff and prevent defendant Richardson Petroleum Company from benefitting by the illegal acts incident to the illicit production and commingling of oil from the Erigan Lease. The amount of excess oil produced and run from the Erigan Lease and the sum of money due plaintiff for his one-sixteenth portion of the value of such oil, based on the highest intermediary market value during such time, amounts to $32,002.38. This amount, together with the amount of $10,000.00 exemplary damage, will fully compensate plaintiff for all damages sustained on account of the excess oil run and commingled from the Erigan Lease."

There is sufficient evidence in the record to support this finding. One Gresham was the gager for the Richardson interest and while he did not keep complete and accurate records of the illegal oil run from the Erigan Lease, he did have considerable records. He was very familiar with just what was done with reference to the illegal running of oil from the Erigan Lease to the Quiros, Harrell and Sedwick Leases, and if he is telling the truth, and the trial judge had a right to believe his testimony, the sum of $32,002.38 will greatly overpay Mooers for his one-sixteenth royalty interest in the oil produced from the Erigan Lease, together with interest. It will be borne in mind that is was W. A. Richardson who inaugurated the unlawful practice of running hot oil. One hundred per cent of the stock in the Richardson Petroleum Company is now owned by parties who had no part in the running of the hot oil. Likewise, the Chicago Bank had loaned great sums of money to the Richardson Petroleum Company and has as its security a lien upon the Petro-

leum Company's physical properties. Under such circumstances the strict rule against commingling of property should not be enforced. In Smith v. Au Gres Township, 6 Cir., 150 F. 257, 259, 261, 9 L.R.A., N.S., 876, 879, it is said:

"When the commingled property is of more value than that wrongfully taken it is equitable that the excess should go to the creditors of the wrongdoer, although by the strict rule of the common law the whole mass might become the property of the innocent owner of the portion misappropriated. Justice requires that the rights of innocent third parties having acquired the property, or some interest in it, for value, should be protected, and against such the rule is not enforced."

Again, in Federal Tender Board No. 1 v. Haynes Oil Corporation, 5 Cir., 80 F.2d 468, 469, the court said:

"There was a fraudulent confusion of bales of cotton, and the burden was put on the wrongdoer to identify or lose his own bales * * *. 'It applies in no case where the goods intermingled remain capable of identification nor where they are of the same quality or value, as where guineas are mingled or grain of the same quality.' Commingling and proportionate separation is daily practiced in the business of grain elevators, pipe lines, and the like. We see no reason why the practice is not proper here. It may be that doubts as to quantity are to be resolved against a commingler, but we have no such question."

The amount of illegal oil produced from the Erigan Lease has been shown with reasonable accuracy. The measure of appellant's recovery would be one-sixteenth of the value of such illegal oil, plus interest at the legal rate. This the trial court awarded to him. Sharp v. Beacon Oil Co., Tex. Civ.App., 108 S.W.2d 870; Ortiz Oil Co. v. Luttes, Tex.Civ.App., 141 S.W.2d 1050; Ortiz Oil Co. v. Geyer, 138 Tex. 373, 159 S.W.2d 494.

Having denied appellant the right of forfeiture of the Erigan Lease and the cancellation of the assignment of the Quiros Lease, it follows that the trial court properly denied appellant any and all relief prayed for against the First National Bank of Chicago and the Republic Supply Company.

All other points presented by appellant have been examined and are overruled.

The judgment is affirmed.

### On Motion for Rehearing.

■ Upon motion for rehearing we have concluded that the trial judge erred in not applying in this case the doctrine of commingling of assets. On a more deliberate consideration we have concluded that the record shows that it was impossible for the trial judge to determine with reasonable certainty the amount of oil illegally run from the Erigan and Quiros leases and commingled with oil from other leases. In our original opinion we were of the impression that the testimony of Gresham made it reasonably certain as to the amount of stolen oil run from these leases, but we are now of the opinion that his testimony shows that no accurate and complete records were kept and that his testimony was simply a guess. Gresham admitted there was no way to determine the amount of oil stolen. Not only were oils from different wells and different leases commingled, but oils of different specific gravities, and therefore of different values, were blended. It is now impossible to unscramble the commingled mass caused entirely by the willful misconduct of the defendant and its predecessors. It was the duty of the trial judge to resolve all doubts in favor of appellant.

The trial judge's finding to the effect that he could determine the amount of illegal oil run from the Erigan lease, with reasonable certainty, is not sustained by the evidence but is contrary to the evidence.

Since appellee willfully and fraudulently commingled and confused the oil from the Erigan lease with the oils from the Quiros, Harrell and Sedwick leases and did not keep or destroyed all records which would have disclosed how much oil was actually stolen from the Erigan lease, appellant should be permitted to recover his 1/16th royalty of all oils run from the wells which were connected by secret pipes with wells upon the Erigan lease. The price should be the intermediate price and the sums of money thus determined should bear interest

at the legal rate from the dates such royalty payments accrued.

This measure of damages must necessarily be adopted because it is impossible to ascertain with any degree of certainty the oil produced from the Erigan lease. To prevent the possibility of injustice to the innocent party, the wrongdoer must pay double royalty on that unknown quantity of oil actually produced from the Quiros, Harrell and Sedwick leases. Gribben v. Carpenter, 323 Pa. 243, 185 A. 712; Stone v. Marshall Oil Co., 208 Pa. 85, 57 A. 183, 65 L.R.A. 218, 101 Am.St.Rep. 904; Benavides v. Benavides, Tex.Civ.App., 218 S.W. 566; Andrews v. Brown, Tex.Com. App., 10 S.W.2d 707; Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, 498; Johnson v. Hocker, Tex.Civ.App., 39 S.W. 406; Holloway Seed Co. v. Bank, 92 Tex. 187, 47 S.W. 95; Union Naval Stores v. United States, 240 U.S. 284, 36 S.Ct. 308, 60 L.Ed. 644; Hentz v. The Idaho, 93 U.S. 575, 23 L.Ed. 978; Kleppner v. Lemon, 197 Pa. 430, 47 A. 353.

The judgment of the trial court is reversed and remanded, with instructions to the trial court to enter judgment in keeping with this opinion.

## On Motions for Rehearing.

Appellant, Clifford Mooers, in his second motion for a rehearing, has furnished us with a schedule which enables us to here render judgment without the necessity of remanding the cause to the trial court. Accordingly, this motion will be granted, the judgment of this Court affirming the judgment of the trial court, heretofore rendered on June 26, 1946, will be set aside, and likewise the judgment of this Court reversing and remanding the cause heretofore rendered on September 25, 1946, will be set aside, and the judgment of the trial court will be amended so as to permit a recovery by appellant against Richardson Petroleum Company in the sum of $91,320.-21, together with interest at the rate of 6% per annum from September 25, 1946, until paid, as actual damages instead of $32,002.38, and as thus amended the judgment of the trial court will be in all things affirmed.

The sum of $91,320.21 is 1/16 of the value of the oil run to pipe lines from tanks connected to Quiros Well No. 2, from December, 1935, to September, 1936, from tanks connected to Harrell Well No. 1, from March, 1936, to January, 1937, from tanks connected to all of the wells on the Sedwick lease producing low gravity oil, from April, 1935 to January, 1937, computed at the sum of $1.22 per barrel, being the highest intermediate price of oil of 25-26 gravity then being produced from Erigan well No. 1 and 1/16 of the value of all oil run to pipelines from tanks connected to Harrell Well No. 1, from February, 1937, to March, 1941, from tanks connected to Sedwick Well No. 7, from June, 1938, to May, 1939, and from tanks connected to all the wells producing low gravity oil from the Sedwick lease from February, 1937, to March, 1941, computed at $1.40 per barrel, being the highest intermediate price paid for oil produced from Erigan Wells Nos. 2 and 3, the first of which began producing both legal and illegal oil on the 1st day of February, 1937, plus interest at the rate of six per cent from the 20th day of the month following the month in which the oil was produced to the 25th day of September, 1946.

At the request of appellant, the Court makes the following additional findings of fact, to-wit:

1. That appellee Richardson Petroleum Company and its predecessors, immediately upon coming into possession of the Erigan lease and reconditioning Erigan well No. 1 into a fine oil well, began laying a network of hot oil lines from the wells and tanks on the Erigan lease, the first being a line connecting the manifold of Erigan well No. 1 with the manifold of Quiros well No. 2 late in December, 1935; that later, in March, 1936, a line was laid from the tanks on the Erigan lease to the gun barrel connected to Harrell well No. 1, and in April a line was laid connecting the wells and tanks on the Erigan lease to the wells on the Sedwick lease; that as new wells were drilled on the Erigan lease these were connected to such hot oil line by the use of bleeder lines on the storage tanks and also by the use of direct connections between

the flow lines of Erigan well No. 2 and Erigan well No. 3; that these lines were later connected to a large Mud Hog pump situated about the boundary line dividing the Quiros and Erigan leases, and that excess oil produced on the Erigan lease could be and was transferred through the use of such Mud Hog pump and hot oil system to the three wells on the Harrell lease, all of the wells on the Sedwick lease and wells Nos. 2 and 8 on the Quiros lease; that such line was so constructed that by the use of various valves and cut-offs oil could be transferred from any one of the three wells on the Erigan lease to any of the wells above enumerated, and that such line was maintained until December, 1941, when the same was discovered for the first time and dug up and broken out under the direction of the authorities of the Federal Petroleum Board; but that the use of such line for running oil from the Erigan lease was discontinued the latter part of March, 1941, when the officials of the appellee company became frightened and switched their illegal operations to other leases.

2. That appellee Richardson Petroleum Company, immediately upon coming into possession of the Erigan and Quiros leases in December, 1935, began the practice of laying secret lines from the Erigan lease to other leases owned by such company and of running indeterminate amounts of hot oil from the Erigan lease to such other leases in the vicinity owned by appellee company and its predecessors in title.

3. That appellee Richardson Petroleum Company supplied Quiros well No. 2 with all of its oil from December, 1935, to April, 1936, and that in May, 1936, Quiros well No. 2 began making a small amount of oil in the form of a fine spray, and the remainder of its allowable and pipe line runs was supplied by Erigan well No. 1 through September, 1936, through the use of secret underground lines connecting the manifold of Erigan well No. 1 and Quiros well No. 2.

4. That upon Harrell well No. 1 coming into production in March, 1936, appellee Richardson Petroleum Company or its predecessors laid a secret hot oil line from Erigan well No. 1 to Harrell well No. 1, and continuously supplied such Harrell well No. 1 with large and indeterminate amounts of illegal oil stolen from the Erigan lease and this appellant from March, 1936, until the latter part of March, 1941, when appellee company became frightened and ceased taking oil from the Erigan lease and switched its illegal operations to other leases owned by appellee company.

5. That upon Sedwick wells coming into production in April, 1936, appellee Richardson Petroleum Company and its predecessors immediately laid a secret hot oil line from Erigan well No. 1 to the wells then producing on the Sedwick lease, and from that time forward continuously and secretly moved large amounts of oil from the Erigan lease to the wells on the Sedwick lease until the latter part of March, 1941, when appellee company became frightened and ceased taking oil from the Erigan lease and moved its illegal operations to other leases owned by such company; that large amounts of oil were moved through this secret underground hot oil system, but that no records were kept thereof, and that it is impossible to determine how much oil was so moved, but that such operations were continuous and were done without the knowledge or consent of appellant, Clifford Mooers; that as new wells were drilled on the Sedwick lease they were connected with this secret hot oil line and supplied to some extent with oil stolen from the Erigan lease and appellant; that the only well on such lease not continuously connected with such hot oil line was Sedwick well No. 7.

6. That it was the general practice of appellee company, as shown by the undisputed testimony in the record before this Court, to make up the deficiency in any of its wells on the Quiros, Harrell and Sedwick leases from excess oil produced by wells on the Erigan lease, in which appellant had and has an interest, and that this practice was generally followed and was continuous from the time appellee took possession of the Erigan lease in December, 1935, until March of 1941.

7. That in 1939 the only low gravity wells on the Quiros lease, being wells Nos. 2 and 8, fell off in production and during the period from January, 1931, to Decem-

ber, 1940, oil from the Erigan lease was transferred both by the use of the Mud Hog pump situated between the two leases and by a process of equalization and siphoning to make up the deficiency in such wells, and that such practice was continuous from January, 1939, to December, 1940.

8. That Harrell wells Nos. 2 and 3, being high gravity wells, became deficient in the last year of their life, to-wit, June, 1938, to May, 1939, and that during such period large amounts of oil were transferred from the Erigan lease to Harrell wells Nos. 2 and 3 and run to the pipe line from such wells as if produced by them.

9. That Sedwick well No. 7, being the only high gravity well on the Sedwick lease, became deficient the last year of its life, to-wit, June, 1938 to May, 1939, and was unable to make its allowable as set by the Railroad Commission of Texas, and that continuously during such period large amounts of oil were transferred from the wells and tanks on the Erigan lease to the gun barrel, and thence into the tanks supposedly connected only to Sedwick well No. 7, and run to the pipe line as if produced from Sedwick well No. 7.

The motions for rehearing by appellees will be overruled. Appellant's motion for a rehearing is granted in part as above shown.